[No. D046757. Fourth Dist., Div. One. Feb. 9, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MARKUS D. GOODWILLIE, Defendant and Appellant.

**COUNSEL**

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gil Gonzalez and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

I.

## INTRODUCTION

Appellant Markus D. Goodwillie appeals from his conviction for burglary, unlawfully taking an automobile, assault with a deadly weapon, petty theft, evading an officer with reckless driving, and resisting an officer.

At his arraignment, Goodwillie waived his right to be represented by counsel, choosing instead to represent himself. At that time, the judge who conducted the arraignment appointed advisory counsel to assist Goodwillie in preparing his case. On the day originally set for trial, the judge who was assigned to try the case relieved the attorney who was serving as advisory counsel to Goodwillie, sua sponte, commenting that he did not believe Goodwillie had a right to the assistance of advisory counsel.[1] After the trial judge relieved Goodwillie's advisory counsel, the judge asked Goodwillie whether he wished to continue representing himself in light of the fact that he would no longer have the assistance of advisory counsel. Goodwillie reaffirmed his decision to represent himself. At trial, the jury convicted Goodwillie on all counts.

On appeal, Goodwillie argues that (1) the trial court violated his Sixth Amendment right to the assistance of counsel when the judge relieved Goodwillie's advisory counsel; (2) the court violated his due process and Sixth Amendment rights by failing to ascertain whether Goodwillie "actually understood" the significance and consequences of his decision to represent himself; (3) the court violated his due process and Sixth Amendment rights

---

[1] The trial was subsequently postponed for approximately one month.

by granting the prosecution's motion to exclude the testimony of an eyewitness identification expert; and (4) his due process and Sixth Amendment rights were violated when both the court and the prosecutor misinformed him of the amount of credit he could receive for good behavior under a plea offer the prosecutor had extended to him.

While the trial court erred in reconsidering and effectively reversing the order of another judge appointing advisory counsel for Goodwillie, we conclude that the trial court's decision to relieve advisory counsel did not violate Goodwillie's Sixth Amendment rights. Because Goodwillie has not established that he was prejudiced by the court's decision to relieve his advisory counsel, reversal on this ground is not required.

With respect to the second and third issues Goodwillie raises, the trial court did ascertain that Goodwillie understood the significance and consequences of choosing to represent himself, and thus did not violate Goodwillie's constitutional rights in this regard. We also conclude that the trial court did not violate Goodwillie's due process or Sixth Amendment rights when the court disallowed testimony by an eyewitness identification expert.

Goodwillie's convictions must be reversed, however, because both the court and the prosecutor misinformed Goodwillie regarding his eligibility for good behavior credits under a plea bargain offered by the prosecution, thereby violating Goodwillie's right to due process. The record discloses that Goodwillie would have accepted the plea bargain if he had known that he would in fact be eligible to receive 50 percent credit, rather than 15 percent credit, as he was informed by both the judge and the prosecutor. We therefore vacate the judgment, and remand the matter to the trial court.

On remand, the district attorney may elect, within 30 days, to retry defendant and if the district attorney so chooses, resume the plea negotiation process, or the district attorney may submit the previously offered plea bargain to the trial court for its approval. If the district attorney chooses to submit the plea bargain to the court and the court approves it, the judgment shall be modified consistent with the terms of the plea bargain.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

 1. *The prosecution's case*

On August 9, 2004, John Ralph looked out his bedroom window at his truck, which he had parked outside of his apartment building in a visitor's

stall. Ralph saw a man he later identified as Goodwillie standing near the truck. Ralph saw Goodwillie put something down his pants, then pull his shirt down over the object. Ralph ran downstairs and encountered a neighbor who told him that Goodwillie had been inside the truck. Ralph checked inside the truck and noticed that his handicapped-parking placard was missing. A few weeks later, Ralph saw Goodwillie come out of an apartment across the street from Ralph's apartment complex and get into a silver Chrysler 300M. Ralph had the impression that the car was a rental car.

On the morning of August 9, Margaret King, one of Ralph's neighbors, was outside smoking a cigarette when she saw a man sitting in the driver's seat of a white Ford Expedition. She watched the man get out of the vehicle and walk across the street. She then saw Ralph run out of his apartment. Ralph asked King whether she had seen a man in his vehicle. King picked Goodwillie's photo from a photo lineup and identified him as the man who had been sitting in Ralph's Expedition. King later observed Goodwillie driving a silver car, and saw him go into one of the apartments across Presioca Street.

On August 18, 2004, Goodwillie burglarized the apartment of Jaime Ocadiz.[2] Goodwillie entered the apartment through a bedroom window after Ocadiz left for work. Goodwillie took a DVD player, speakers, a VCR, and approximately $25 to $30 from the apartment.

The manager of Ocadiz's apartment complex, who lived in the apartment below Ocadiz, set up a surveillance video system in his personal backyard on August 18 because items were missing from his apartment, and there had been break-ins at other apartments in the complex. The manager turned on the surveillance system before he left for work that morning. When he returned home at approximately 5:00 p.m., he reviewed the video. The manager saw Goodwillie on the video. The manager knew that Goodwillie was "unofficially" staying in apartment A-4 in the complex.[3] He knew that Goodwillie's first name was Markus, and he had seen Goodwillie driving a silver car.

San Diego County Sheriff's Detective Oscar Escobedo investigated the theft of Ralph's handicapped-parking placard. When Detective Escobedo presented a photo lineup to Ralph and King, both picked out Goodwillie's photograph. Ralph told detectives that he had seen Goodwillie driving a silver car. Detective Escobedo located the car. After running the license plate number of the silver car through the police database, Detective Escobedo

---

[2] Ocadiz lived in an apartment complex across the street from Ralph's apartment.

[3] The manager explained that Goodwillie's name was not on a rental agreement, but that he "knew that [Goodwillie] was living in one of the apartments."

determined that the vehicle had not been reported stolen. Detective Escobedo contacted Thrifty Rent A Car and discovered that the silver Chrysler was one of its cars and that it had been missing since July 27, 2004. Escobedo instructed the rental car agency representative to report the car stolen.

On August 18, 2004, San Diego County Deputy Sheriff Robert Day responded to a burglary call at Ocadiz's apartment complex. Deputy Day contacted the apartment complex manager, who gave Day the videotape from his security camera. Deputy Day lifted fingerprints from a window in Ocadiz's daughter's room and from a sliding glass door. A fingerprint examiner concluded that a latent print lifted from the bedroom window at the Ocadiz apartment matched Goodwillie's right middle fingerprint.

On August 19, deputies conducted a search for a silver Chrysler near Presioca Street, the street on which Ralph's and Ocadiz's apartment buildings were located. After they located the vehicle parked on a nearby street, deputies watched as Goodwillie got into the Chrysler and drove toward the end of that street. The deputies followed Goodwillie down the street in three patrol cars with their lights and sirens activated. Goodwillie turned onto Presioca Street and then onto another nearby street. Two patrol cars blocked the intersection, preventing a Lincoln that was being driven by Deandre Pamplin from moving through the intersection. Goodwillie started to get out of the Chrysler, but then got back in and accelerated toward the Lincoln and the police blockade. Goodwillie crashed the Chrysler into the Lincoln, pushing it through the blockade of patrol cars. Pamplin suffered injuries to his back and neck. The crash caused $6,000 in damages to Pamplin's car.

After he collided with the Lincoln, Goodwillie drove the Chrysler through the police blockade, and continued driving to Birch Street. Goodwillie crashed into a trailer at the dead end of Birch Street and fled on foot. A sheriff's deputy chased Goodwillie as he climbed over several fences and ran into a mobilehome park, but Goodwillie evaded apprehension. One deputy thought that Goodwillie might be heading to the apartment where the deputies had surveilled him earlier. The deputy contacted the police dispatcher and requested that the dispatcher send deputies back to the apartment.

When deputies inspected the abandoned Chrysler, they found John Ralph's stolen handicapped-parking placard in the glove compartment.

Sheriff's deputies returned to the apartment where Goodwillie had been staying and knocked on the door. They received no response. The deputies obtained a key to the apartment from the apartment manager and entered the apartment. Inside they found Goodwillie, wearing only a towel. He had

scratches on his arms and legs. Deputies noticed clothing covered with oil inside the apartment. The sheriff's deputy who had chased Goodwillie had oil on his hands.

In a postarrest interview, Goodwillie told law enforcement officers that a friend had loaned him the Chrysler and that the friend was supposed to return to retrieve the car after a couple of days. The friend never came back to get the car, so Goodwillie continued to drive it. When Goodwillie saw deputies chasing him, he realized that the car must be stolen. He said that he ran away because he did not want to go to jail. Goodwillie denied that he had taken Ralph's handicapped-parking placard, and also denied having burglarized the Ocadiz apartment. However, after a detective showed him the surveillance video taken at the time of the burglary, Goodwillie admitted that he had been at the scene of the burglary, and that he had sold the items that were taken during the burglary in order to buy "dope." Goodwillie also admitted that he had crashed into the Lincoln and the patrol car.

### 2. Goodwillie's defense

Goodwillie's defense was mistaken identification. Deputy Villalobos testified that he did not see Goodwillie leave his apartment, but that he did see Goodwillie get into the Chrysler. Villalobos also testified that when the deputies returned to the apartment complex to search for Goodwillie after the car chase, the deputies went to apartment B-4 before they eventually found Goodwillie in apartment A-4.

Ralph testified that he remembered that he had estimated that the man he saw near his vehicle was the same height as Goodwillie, but he admitted that because he was looking down on the scene, he could not really tell how tall the man was. Ralph said he could not recall what he had told Deputy Sanchez. Deputy Sanchez testified that Ralph had not indicated that he knew the suspect or that he had seen the suspect in the neighborhood at the time he reported the theft of his handicapped-parking placard.

In an apparent attempt to establish that the assault was not a serious one, Goodwillie's attorney elicited testimony from Pamplin that Pamplin had told police that he was fine and in no pain immediately after Goodwillie crashed into his car. He did not see a chiropractor until August 24, 2004, six days after the incident.

### B. Procedural background

Goodwillie was arraigned on criminal charges and entered not guilty pleas on August 24, 2004. The court granted Goodwillie's request to represent

himself, and ordered the appointment of ancillary counsel.[4] Goodwillie signed a *Lopez* waiver form.[5]

On November 30, 2004, the court conducted a preliminary examination, during which Attorney Alan Williams served as advisory counsel to Goodwillie.

On December 8, 2004, the People filed an information charging Goodwillie with one count of petty theft (Pen. Code, § 484 (count 1)); one count of burglary (Pen. Code, § 459 (count 2)); one count of unlawfully taking a motor vehicle (Veh. Code, § 10851, subd. (a) (count 3)); one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1) (count 4)); one count of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (c) (count 5); one count of evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a) (count 6); and one count of resisting an officer (Pen. Code, § 148, subd. (a)(1) (count 7)).

---

[4] In the minute order entered after the arraignment, the arraigning judge appointed what he referred to as "ancillary counsel" to assist Goodwillie. From the context of the trial court's appointment, and the assisting attorney's later description of the services he provided to Goodwillie, it appears that the arraigning judge envisioned providing Goodwillie with the sort of " 'hybrid' form[] of representation" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1218 [259 Cal.Rptr. 669, 774 P.2d 698]) that is often referred to as "advisory counsel." " 'Advisory counsel,' . . . is [an attorney] appointed to assist the self-represented defendant if and when the defendant requests help. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 725 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Unless we are discussing the actual order made by the arraigning court in this case, we will refer to this hybrid form of representation as advisory counsel.

[5] In *People v. Lopez* (1977) 71 Cal.App.3d 568, 571 [138 Cal.Rptr. 36] (*Lopez*), the court suggested a set of advisements "designed to ensure a clear record of a defendant's knowing and voluntary waiver of counsel." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 [119 Cal.Rptr.2d 859, 46 P.3d 335].) "First, the court recommended the defendant be cautioned (a) that self-representation is 'almost always unwise,' and the defendant may conduct a defense ' "ultimately to his own detriment" ' [citation]; (b) that the defendant will receive no special indulgence by the court and is required to follow all the technical rules of substantive law, criminal procedure and evidence in making motions and objections, presenting evidence and argument, and conducting voir dire; (c) that the prosecution will be represented by a trained professional who will give the defendant no quarter on account of his lack of skill and experience; and (d) that the defendant will receive no more library privileges than those available to any other self-represented defendant, or any additional time to prepare. Second, the *Lopez* court recommended that trial judges inquire into the defendant's education and familiarity with legal procedures, suggesting a psychiatric examination in questionable cases." (*Koontz, supra,* 27 Cal.4th at pp. 1070–1071.) The *Lopez* court also suggested that the trial court inquire whether the defendant understands his right to court-appointed counsel, and that the court "explor[e]" the "nature of the proceedings," including the potential defenses and potential punishments, with the defendant. (*Lopez, supra,* 71 Cal.App.3d at p. 573.) Finally, the *Lopez* court noted that the defendant should be made aware that misbehavior or disruption could result in termination of his self-representation and that "in spite of his best (or worst) efforts, he cannot afterwards claim inadequacy of representation." (*Id.* at p. 574.)

Advisory counsel appeared with Goodwillie at hearings that were held on January 18, February 14, and February 28, 2005.

On February 28, the date on which the trial was originally scheduled to begin, Goodwillie appeared in court with his advisory counsel. The trial judge discussed his intention to relieve advisory counsel, sua sponte. Before the court relieved counsel, Goodwillie rejected a plea bargain offer. The trial court then relieved advisory counsel, over Goodwillie's objection. The trial court informed Goodwillie that his options were either to have the court appoint counsel to represent him, or to represent himself without the assistance of advisory counsel. Goodwillie chose to represent himself.

On March 28, 2005, Goodwillie pled guilty to count 1, petty theft with a prior. The court granted Goodwillie's motion to bifurcate the trial on the prior convictions.

The jury trial on the remaining counts began on March 28, and continued on March 29, 30, and April 4. On March 30, the prosecutor filed a motion to exclude eyewitness identification expert testimony. The court granted the motion.

The case was submitted to the jury at 4:30 p.m. on April 4. Immediately thereafter, the court gave the jury standard admonishments and excused them for the day. The jury began deliberating at 9:00 a.m. on April 5. At 10:55 a.m. the jury informed the court that it had reached its verdicts. The jury found Goodwillie guilty on all counts, and found true the allegations pertaining to counts 4 and 5 that Goodwillie had used a vehicle as a deadly weapon.

On April 5, 2005, the trial court found true the allegations that Goodwillie suffered three prison priors.

The trial court sentenced Goodwillie to an aggregate term of 10 years in prison on June 14, 2005. The 10-year sentence consisted of the upper term of six years on count 2 (burglary), eight months on count 1 (petty theft), one year four months on count 5 (assault with a deadly weapon on an officer), and a one-year enhancement for each of the first two prison priors. The court stayed the sentences on counts 3, 4, and 6, pursuant to Penal Code section 654, and struck Goodwillie's third prison prior.

Goodwillie filed a timely notice of appeal on June 24, 2005.

## III.

## DISCUSSION

A. *While the trial court did not violate Goodwillie's constitutional right to the assistance of counsel when it relieved his previously appointed advisory counsel, the court erred in reconsidering and reversing the order of another judge*

### 1. *Background*

On August 24, 2004, just prior to his arraignment, Goodwillie requested that the court allow him to represent himself. Judge Charles Ervin, who conducted the arraignment, discussed with Goodwillie whether Goodwillie understood the contents of the *Lopez* waiver form he had signed. Goodwillie indicated that he had been advised as to the significance and consequences of representing himself.[6] The court granted Goodwillie's request to represent himself and proceeded with the arraignment. The transcript of that hearing does not include any discussion regarding the appointment of advisory counsel. However, the minutes from the hearing indicate that the trial court granted Goodwillie's request to represent himself, ordered the sheriff to provide Goodwillie with "all privileges as to pro pers [*sic*]" and ordered "PCC to provide ancillary counsel."[7]

The minutes from a subsequent readiness conference that was held on September 3, 2004, before Judge William McGrath indicate that no advisory counsel had yet been assigned to Goodwillie. The notes provide: "Clerk's office to contact PCC and [*sic*] provide him with ancillary counsel . . . ." The minutes from at least three subsequent proceedings indicate that Goodwillie continued to proceed in propria persona, and that at these proceedings, "A. Williams" appeared with Goodwillie as "advisory" counsel.[8]

On February 28, 2005, the date originally set for trial, Goodwillie appeared before the trial judge, Judge Preckel, with "Alan Williams as advisory counsel." Goodwillie requested that the trial be continued because he had not received some discovery materials he had requested. The trial court granted Goodwillie's request and began discussing possible trial dates with the

---

[6] We discuss Goodwillie's waiver of counsel further in part III.B., *post.*

[7] We take judicial notice that PCC (Private Conflicts Counsel Program) is a division of the San Diego County Bar Association that provides ancillary services to indigent defendants who are acting in propria persona.

[8] A number of different judges presided at these proceedings, including Judges Ervin and McGrath, Judge Allan Preckel, Judge Herbert Exarhos, and Judge Louis Hanoian.

prosecutor and Goodwillie. When Attorney Williams spoke up to inform the trial judge that he had a scheduling conflict during the week the court was proposing, the judge said:

"Well, that's another matter that, frankly, I wanted to talk about, and that is, why should the court, or the taxpayers, be paying for your services as advisory counsel, Mr. Williams? I recognize you're kind of in the middle, perhaps, in terms of answering that question. But I am raising the issue because there is a philosophical difference, I sense, between and amongst myself and some of my colleagues. My attitude is that a defendant asserts his right to self-representation, and after due consideration and a hearing that request is granted, then the individual in question ought to be representing himself for all purposes. There is no legal entitlement to advisory counsel, or co-counsel, or however you wish to characterize it.

"In other words, in my view, it's an all or nothing situation. Mr. Goodwillie, you either represent yourself or you don't. And that is to say if you don't, then instead you're represented by an attorney acting on your behalf. So we're going to hopefully either reach a meeting of the minds this morning, or else the court is going to rule one way or another regarding your continuing self-representation. And by that, if you wish to continue to represent yourself, fine. But absent some real substantial and persuasive justification as to why the public ought to be paying for Mr. Williams' services as advisory counsel, I'm going to thank and excuse Mr. Williams from further involvement in this case."

After Goodwillie explained to the court why he believed he needed Attorney Williams's assistance, the court said, "No, he's not going to come in any longer absent some showing that that's something to which you're legally entitled, and I know of no s[uch] authority."

The court then asked Attorney Williams what his involvement in the case had been, other than having been present at hearings. While Attorney Williams voiced his discomfort with his position as advisory counsel, he explained that he had advised Goodwillie as to the Evidence Code, trial procedures, how to research the law, and the names of cases. The trial judge responded: "I know it's been done before too, but that doesn't make it right in my view. And don't get me wrong, I certainly appreciate the services that you've rendered. But I also know that like most criminal defense attorneys, you've got a very busy and complex case load of your own. And I question, frankly, whether your time is well spent in advisory capacity [sic] sitting alongside Mr. Goodwillie and figuratively, at least, holding his hand. If he wants to represent himself, great. And if he wants to continue to do so, great. But you're going to be out of the picture after this morning."

After further discussion with Attorney Williams, the court asked the prosecutor, "What's the offer on this case, Ms. Worden? What's it been, or what is it?" The trial court, the prosecutor, and Goodwillie proceeded to discuss plea options. After Goodwillie rejected the final plea offer, the trial judge set a new trial date and said to Goodwillie, "Mr. Goodwillie, understanding and reminding you of the court's statements earlier this morning regarding the continuing involvement of Mr. Williams in this case, I am going to relieve him of this [*sic*] role as advisory counsel."

Goodwillie represented himself, without the assistance of advisory counsel, during the remainder of the criminal proceedings, including trial.

### 2. *Analysis*

#### a. *There is no constitutional right to the assistance of advisory counsel*

Goodwillie contends that the trial court violated his Sixth Amendment right to the assistance of counsel by relieving his appointed advisory counsel just prior to trial.[9] Goodwillie claims that the Sixth Amendment guarantees a self-represented defendant the right to the assistance of advisory counsel. We disagree.

Goodwillie notes that the United States Supreme Court has determined that the Sixth Amendment gives a criminal defendant the right to be represented by counsel (*Powell v. Alabama* (1932) 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55]) and the right to represent himself (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*)). He contends, however, that the United States Supreme Court has never ruled on the specific question he raises—i.e., whether the Sixth Amendment guarantees a defendant the right to the assistance of advisory counsel, or to something less than full representation by counsel. The Attorney General appears to agree that the United States Supreme Court has yet to address this particular question.

The weight of both federal and California precedent, including United States Supreme Court precedent, establishes that a criminal defendant does not have a constitutional right to the assistance of advisory counsel, but that it is within the discretion of trial courts to appoint advisory counsel to assist a criminal defendant who is proceeding in propria persona. (See *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1430 [93 Cal.Rptr.2d 796] ["a defendant

---

[9] We requested further briefing from the parties, asking that they address whether the trial court's actions in relieving advisory counsel on the date set for trial might constitute an abuse of discretion. In deciding this issue, we have considered the arguments the parties made in their supplemental briefing.

who elects to represent himself or herself has no constitutional right to advisory or stand-by counsel or any other form of 'hybrid' representation"], citing *McKaskle v. Wiggins* (1984) 465 U.S. 168, 183 [79 L.Ed.2d 122, 104 S.Ct. 944] (*McKaskle*).)

In *McKaskle*, the United States Supreme Court stated: "*Faretta* does not require a trial judge to permit 'hybrid' representation of the type Wiggins was actually allowed. But if a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a constitutional right to choreograph special appearances by counsel." (*McKaskle, supra*, 465 U.S. at p. 183.)

Both California courts and federal courts have interpreted this language as precluding a conclusion that the Sixth Amendment guarantees the right to advisory counsel or any other "hybrid" form of representation. (See, e.g., *People v. Blair, supra*, 36 Cal.4th at p. 723, quoting *People v. Bloom, supra*, 48 Cal.3d at p. 1218 (*Bloom*) [citing *McKaskle* in support of conclusion that "none of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed"]; *U.S. v. Cromer* (6th Cir. 2004) 389 F.3d 662, 682, fn. 12 [citing *McKaskle* in support of assertion that "[i]t is well settled that there is no constitutional right to hybrid representation"]; *U.S. v. Lawrence* (4th Cir. 1998) 161 F.3d 250, 253 [citing *McKaskle* in support of assertion that "Sixth Amendment does not require a court to grant advisory counsel to a criminal defendant who chooses to exercise his right to self-representation by proceeding *pro se*"]; *U.S. v. Singleton* (4th Cir. 1997) 107 F.3d 1091, 1100 [citing *McKaskle* in support of conclusion that a court may, in its discretion, allow attorney participation as advisory counsel, but that the Constitution does not mandate it].)

The California Supreme Court has long held that advisory counsel and other hybrid forms of representation are not constitutionally mandated. In *People v. Mattson* (1959) 51 Cal.2d 777, 795 [336 P.2d 937], the California Supreme Court stated unequivocally that the appointment of advisory counsel is a discretionary matter: "Our conclusion that a California defendant has no absolute right to the services of an attorney in a mere advisory capacity harmonizes with the federal law as to right to counsel." The California Supreme Court reiterated the rule that a criminal defendant does not have a constitutional right to advisory counsel in *People v. Bigelow* (1984) 37 Cal.3d 731, 744–745 [209 Cal.Rptr. 328, 691 P.2d 994] (*Bigelow*) ("automatic reversal" based on fundamental right to counsel "is inapplicable to the present case, for Bigelow had no absolute right to advisory counsel [citation], but only to a considered exercise of judicial discretion"); see also *People v.*

*Garcia, supra*, 78 Cal.App.4th at page 1430 ("a defendant who elects to represent himself or herself has no constitutional right to advisory or stand-by counsel or any other form of 'hybrid' representation").

Goodwillie argues that much of the language in these cases constitutes dicta, and cannot "overrule the plain language and meaning of the Sixth Amendment right to assistance of counsel." Goodwillie cites *Bloom, supra*, 48 Cal.3d 1194, as supporting his position. The defendant in *Bloom* argued that because he sought only cocounsel status, and did not seek to fully represent himself, his request was addressed to the " ' "sound discretion of the court." ' " (*Id.* at p. 1218.) He then argued that the court had abused its discretion in granting his motion to represent himself because he had sought cocounsel status in order to seek a verdict of death. On appeal, he argued that this purpose violated a public policy against using the judicial system to commit state-aided suicide. (*Ibid.*)

In setting out the legal framework in which it was reviewing Bloom's contention, the California Supreme Court stated: "While the Sixth Amendment guarantees both the right to self-representation and the right to representation by counsel, a defendant who elects representation by counsel does not have a constitutionally protected right to appear as cocounsel [citations], and a defendant who elects self-representation 'does not have a constitutional right to choreograph special appearances by counsel' [citation]. *Thus none of the 'hybrid' forms of representation, whether labeled 'cocounsel,' 'advisory counsel,' or 'standby counsel,' is in any sense constitutionally guaranteed.*" (*Bloom, supra*, 48 Cal.3d at p. 1218, italics added.)

■ Goodwillie asserts that this language was not only dicta, but that it was a "gratuitous conclusion" that went "far beyond the principles in *Hamilton* or *McKaskle*."[10] (See *People v. Hamilton* (1989) 48 Cal.3d 1142 [259 Cal.Rptr. 701, 774 P.2d 730] (*Hamilton*); see also *McKaskle, supra*, 465 U.S. 168.) We are, however, bound by the Supreme Court's repeated holdings that the Sixth Amendment does not provide a criminal defendant with the right to any hybrid form of representation, including advisory counsel.

---

[10] In *McKaskle*, the United States Supreme Court was addressing the issue whether a court violated a defendant's right to self-representation by appointing standby counsel, over the defendant's objections. The court concluded that the Sixth Amendment does not preclude "[p]articipation by counsel to steer a defendant through the basic procedures of trial . . . even in the unlikely event that it somewhat undermines the *pro se* defendant's appearance of control over his own defense." (*McKaskle, supra*, 465 U.S. at p. 184.) We recognize that the United States Supreme Court did not directly address whether a criminal defendant has a right to advisory counsel in *McKaskle*. However, the California Supreme Court has concluded that the Constitution does not guarantee a right to advisory hybrid representation.

The Supreme Court's decision in *Hamilton* further supports the conclusion reached in *Bloom*. In *Hamilton*, the Supreme Court stated, "A criminal accused has only two constitutional rights with respect to his legal representation, and they are mutually exclusive. He may choose to be represented by professional counsel, or he may knowingly and intelligently elect to assume his own representation. [Citation.] An accused who chooses professional representation, rather than self-representation, has no right to participate as cocounsel. [Citations.]" (*Hamilton, supra*, 48 Cal.3d at p. 1162.)[11] It is thus clear that under California law a criminal defendant's constitutional rights regarding counsel are either full representation by counsel or self-representation.

The California Supreme Court has thus clearly held that the Constitution does not guarantee a criminal defendant the right to the assistance of advisory counsel when he or she chooses to exercise the right to self-representation. Under California law, a criminal defendant's constitutional rights regarding counsel are either full representation by counsel or self-representation. Goodwillie's assertion that the Sixth Amendment affords him the right to represent himself and at the same time receive the assistance of advisory counsel thus fails.

b. *The trial judge did not have the authority to reconsider the arraigning judge's ruling appointing advisory counsel to assist Goodwillie*

Although Goodwillie had no constitutional right to the assistance of advisory counsel, under the particular circumstances of this case, the trial judge erred in relieving advisory counsel previously appointed by the arraigning judge. However, Goodwillie has failed to establish that this error was prejudicial.

██ A trial court generally has the authority to correct its own prejudgment errors. (*In re Alberto* (2002) 102 Cal.App.4th 421, 426 [125 Cal.Rptr.2d 526] (*Alberto*).) " 'In criminal cases, there are few limits on a court's power to reconsider interim rulings . . . .' [Citation.]" (*Ibid.*) However, the general rule does not apply when it is a different judge who is reconsidering the interim ruling. (*Id.* at p. 427.)

---

[11] Even when considering the issue in the context of a defendant facing the death penalty, the California Supreme Court concluded only that the trial court had *abused its discretion* by failing to appoint advisory counsel; the court did not conclude that the defendant had a *constitutional right* to advisory counsel. (See *Bigelow, supra*, 37 Cal.3d at pp. 744–746.) In *Bigelow*, the trial court erroneously determined that it was not within the trial court's discretion to appoint advisory counsel to assist the defendant. The Supreme Court concluded that the trial court not only possessed the discretion to appoint advisory counsel, but that if the trial court had exercised that discretion and had decided not to appoint advisory counsel, that would have constituted an abuse of discretion under the circumstances of that particular case.

"For one superior court judge, no matter how well intended, even if correct as a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court. 'The Superior Court of Los Angeles County, though comprised of a number of judges, is a single court and one member of that court cannot sit in review on the actions of another member of that same court.' [Citation.] Stated slightly differently, because a superior court is but one tribunal, an order ' " ' "made in one department during the progress of a cause can neither be ignored nor overlooked in another department . . . ." ' " ' [Citation.]" (*Alberto, supra,* 102 Cal.App.4th at pp. 427–428.) The *Alberto* court explained the reasoning behind this rule: "Different policy considerations . . . are operative if the reconsideration is accomplished by a different judge. Accordingly, [in those situations] the general rule is just the opposite: the power of one judge to vacate an order made by another judge is limited. [Citation.] This principle is founded on the inherent difference between a judge and a court and is designed to ensure the orderly administration of justice. 'If the rule were otherwise, it would be only a matter of days until we would have a rule of man rather than a rule of law. To affirm the action taken in this case would lead directly to forum shopping, since if one judge should deny relief, [parties] would try another and another judge until finally they found one who would grant what they were seeking. Such a procedure would instantly breed lack of confidence in the integrity of the courts.' [Citation.]" (*Id.* at p. 427.)

The rule that one superior court judge may not reconsider the previous ruling of another superior court judge applies in a variety of settings, in both criminal and civil cases. (See, e.g., *People v. Madrigal* (1995) 37 Cal.App.4th 791, 795–797 [43 Cal.Rptr.2d 498] [ruling of second judge imposing a prison sentence after probation violation hearing is unlawful when first judge had earlier reinstated probation]; *Elsea v. Saberi* (1992) 4 Cal.App.4th 625, 630–631 [5 Cal.Rptr.2d 742] [second judge without power to vacate default judgment entered by first judge].)

There are a few exceptions to the general rule that one superior court judge may not vacate or otherwise nullify the order of another. Reversal of a judgment and remand for new trial permits the "renewal and reconsideration of pretrial motions and objections to the admission of evidence. [Citation.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 849 [268 Cal.Rptr. 802, 789 P.2d 983].) In addition, two narrow lines of cases "appear to authorize one trial judge to reconsider an issue already decided by a colleague: one, where the first judge is unavailable [to decide a motion for reconsideration] [citation], or

two, where the first order was made through inadvertence, mistake, or fraud. [Citations.]" (*Alberto, supra*, 102 Cal.App.4th at p. 430.)[12]

Here, the trial judge reversed, sua sponte, the arraigning judge's order that advisory counsel be appointed to assist Goodwillie. The trial judge acknowledged that his decision to deny Goodwillie the assistance of advisory counsel was based on a "philosophical difference" between himself and "some of [his] colleagues." The situation in this case does not fall within any of the narrow exceptions to the general rule that limits reconsideration of one judge's order by a different judge. There was no reversal and remand, no motion for reconsideration, and no showing that the original ruling was the result of inadvertence, mistake, or fraud. Further, there is no statutory provision that specifically authorizes reconsideration of this issue. The trial judge's order relieving advisory counsel appears to be precisely the type of action the rule is meant to prevent in that the trial judge essentially reviewed and rescinded the arraigning judge's order. The arraigning judge exercised his discretion to appoint advisory counsel; the trial judge did not have the authority to nullify that order.

While the trial judge erred in reversing the arraigning judge's order, Goodwillie has not established that he suffered prejudice as a result of the trial judge's error. Although Goodwillie maintains that the trial judge's decision to relieve advisory counsel amounted to a deprivation of the assistance of counsel in violation of the Sixth Amendment such that reversal per se is required, for the reasons stated in part III.A.2.a., *ante*, we disagree. Goodwillie was provided with advisory counsel because the arraigning judge exercised his discretion to appoint such counsel, not because Goodwillie had a constitutional right to the assistance of advisory counsel. The trial court's subsequent improper reversal of the arraigning judge's exercise of discretion thus does not require automatic reversal.

We recognize that in *People v. Bigelow, supra*, 37 Cal.3d at pages 744–746, the Supreme Court concluded that per se reversal would be required in a case in which the trial court's refusal to appoint advisory counsel was an

---

[12] Another exception exists where a statutory provision specifically grants a judge the authority to consider a previous order and make necessary changes. (*People v. Konow* (2004) 32 Cal.4th 995, 1021 [12 Cal.Rptr.3d 301, 88 P.3d 36] ["[W]e conclude that when one judge . . . reviews an order of another judge compelling the magistrate to reinstate the complaint under section 871.5, *under the authority granted by section 871.5 itself*, the first judge acts properly, and does not threaten the orderly administration of justice or place himself or herself in the role of a one-judge appellate court over the second judge"].)

abuse of discretion.[13] In *Bigelow, supra,* 37 Cal.3d at page 744, the Supreme Court concluded that under the specific circumstances of that capital case, the trial court had abused its discretion by failing to recognize that it was within the court's discretion to appoint advisory counsel to assist the defendant. The Supreme Court concluded that no trial court could have reasonably denied Bigelow the assistance of advisory counsel, thus effectively holding that Bigelow had a right to the assistance of advisory counsel under the circumstances of that case.

The Supreme Court applied the per se reversal rule in *Bigelow* not because the defendant had an absolute right to advisory counsel, but rather, because it was impossible to determine "the effect of the absence of [advisory] counsel upon the presentation of the case." (*Bigelow, supra,* 37 Cal.3d at p. 745.) The court explained: "Some decisions justify a rule of automatic reversal by emphasizing the fundamental character of the right to counsel. [Citation.] That rationale is inapplicable to the present case, for Bigelow had no absolute right to advisory counsel [citation], but only to a considered exercise of judicial discretion. A second reason for a rule of per se reversal, however, applies fully in the present setting: the impossibility of assessing the effect of the absence of counsel upon the presentation of the case." (*Id.* at pp. 744–745.)

We conclude that the per se reversal rule articulated in *Bigelow, supra,* 37 Cal.3d at page 746, does not apply here. Unlike in *Bigelow,* if it had been the trial judge in this case who had considered in the first instance whether to appoint advisory counsel to assist Goodwillie, there is no doubt that a decision not to appoint advisory counsel would not have constituted an abuse of discretion.[14] The *Bigelow* court was careful to limit its ruling to the particular circumstances of that case, including the fact that the defendant

---

[13] "No cases have defined the test of prejudice for failure to exercise discretion concerning the appointment of advisory counsel, but when as here a refusal to so appoint would be an abuse of discretion, we believe the same rule of per se reversal should apply." (*Bigelow, supra,* 37 Cal.3d at p. 744.)

[14] "*Bigelow, supra,* 37 Cal.3d 731, did not establish a 'fixed rule' that advisory counsel must be appointed for every pro se defendant in a capital case, and thus the question whether denial of a request for advisory counsel would have been an abuse of discretion must be determined on a case-by-case basis. 'As with all actions by a trial court within the exercise of its discretion, as long as there exists "a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside, even if, as a question of first impression, we might feel inclined to take a different view from that of the court below as to the propriety of its action." ' [Citation.]" (*People v. Crandell* (1988) 46 Cal.3d 833, 863 [251 Cal.Rptr. 227, 760 P.2d 423].)

was facing the death penalty, and that the defendant "proved totally incompetent as a defense attorney," such that the "trial of a capital case could rightly be described as a ' "farce or a sham." ' [Citation.]" (*Bigelow, supra,* 37 Cal.3d at p. 745.)[15]

Those circumstances are not present here. The trial judge's error was not that he should have appointed advisory counsel to assist Goodwillie and failed to do so, but rather, that he should not have reversed a duly entered order made by another superior court judge. The nature of this error is fundamentally different from the abuse of discretion found in *Bigelow.* Because it would not have been error to deny Goodwillie the assistance of advisory counsel at the outset, the per se reversal standard does not apply. (Cf. *People v. Crandell, supra,* 46 Cal.3d at p. 865 [where trial court failed to exercise any discretion on defendant's request for advisory counsel but a refusal to grant the request would not have been an abuse of discretion, per se reversal rule does not apply].)

Because the error in this case is not of constitutional dimension, we conclude that the proper standard by which to determine prejudice is the test announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (*People v. Crandell, supra,* 46 Cal.3d at p. 865 [failure to exercise discretion on request for advisory counsel does not implicate constitutional right and *Watson* prejudice standard applies].)[16] Goodwillie argues that he was prejudiced by the lack of advisory counsel because he was given only one month

---

[15] Although it is clear from language in *Bigelow* that the Supreme Court was not relying on the Sixth Amendment's guarantee of the right to counsel in concluding that the trial court would have abused its discretion if it had exercised that discretion to deny Bigelow advisory counsel, the Supreme Court did not explain the source of the defendant's right. (*Bigelow, supra,* 37 Cal.3d at p. 745.) At one point, the court appears to have created a new right: "A rule of per se reversal is the only way to protect *the right of a defendant to a conscientious exercise of judicial discretion on the appointment of advisory counsel,* and to vindicate the state's independent interest in the fairness and accuracy of a capital proceeding. [Citation.]" (*Id.* at p. 746, italics added.) The point remains confusing, however, since the Supreme Court's decision to employ the per se reversal rule appears to have arisen from concern about the failure to appoint advisory counsel, and not from the trial court's failure to conscientiously exercise its judicial discretion: "No cases have defined the test of prejudice for failure to exercise discretion concerning the appointment of advisory counsel, *but when as here a refusal to so appoint would be an abuse of discretion,* we believe the same rule of per se reversal should apply." (*Id.* at p. 744, italics added; but see *People v. Hutton* (1986) 187 Cal.App.3d 934, 941 [232 Cal.Rptr. 263] ["Contrary to the defendant's argument, *People v. Bigelow, supra,* does not give all criminal defendants a right to per se reversal of all cases in which motions for cocounsel are denied. . . . Thus, a criminal defendant is entitled only to the considered exercise of judicial discretion[,] not to an absolute right of reversal when his motion for cocounsel status is denied by the court"].)

[16] Goodwillie argues that per se reversal should apply under the facts of this case. However, he also suggests that under *People v. Crandell, supra,* 46 Cal.3d at page 865, the *Watson* standard applies "[i]f the trial court abuses its discretion in refusing to appoint advisory counsel." Although the error in *Crandell* is slightly different from the error here (i.e., failure to

from the time the trial judge relieved advisory counsel to prepare for trial, and this was insufficient to allow him to "gain the legal expertise necessary to replace the assistance of counsel." Goodwillie contends that because he was "incapable of making a legal counter-argument[,] the motion [by the prosecution to exclude expert testimony on witness identification] was granted[,] despite the fact that appellant's defense was mistaken identity." Goodwillie also asserts that he was prejudiced because he failed to make objections and to conduct cross-examination at trial that advisory counsel would have recommended, and because advisory counsel could have prevented him from making certain tactical errors.[17]

It is not at all clear that the trial court would have denied the prosecutor's motion to exclude the eyewitness identification expert's testimony if Goodwillie had presented a different argument in opposition. Goodwillie has not established how advisory counsel would have been able to assist Goodwillie in presenting argument on that matter. Further, even if the court had denied the prosecution's motion and the jury had heard from Goodwillie's expert, we are unconvinced that the jury would have returned with a different result. The jury heard testimony that Goodwillie admitted he crashed the Chrysler into the other vehicles. They saw the clothing found in the apartment where Goodwillie was apprehended, marred with small holes and oil stains. The deputy who chased the perpetrator on foot got oil on his hands from climbing the fences during the chase that was similar to the oil on the clothing found with Goodwillie. There were also a number of eyewitnesses who identified Goodwillie as the perpetrator, all of whom were law enforcement officials. The evidence of Goodwillie's guilt was strong, and Goodwillie presented no evidence that cast doubt on the eyewitness testimony. He did not present an alibi defense, nor did he present any witnesses who believed Goodwillie was not the perpetrator of the crimes that occurred that day. There is thus no reasonable likelihood that expert testimony as to the unreliability of eyewitness identification would have led to a more favorable result.

The same is true as to Goodwillie's other contentions regarding prejudice. Goodwillie's assertions that he was prejudiced by the lack of advisory counsel implicate the effectiveness of his own representation. All of the problems Goodwillie raises are the type of problems about which defendants

exercise discretion at all, as opposed to the unauthorized exercise of discretion), we agree that the same standard of prejudice should apply.

[17] The errors Goodwillie raises include his playing a tape from September 11, 2001, "that included inflammatory matters," failing to make routine motions to exclude witnesses from the courtroom, asking harmful questions, failing to submit pinpoint jury instructions, not recognizing and objecting to prosecutorial misconduct, and "being helpless to know what to do at the sentencing hearing."

wishing to represent themselves are forewarned. Goodwillie chose to represent himself despite having been warned of the potential negative consequences of doing so. Goodwillie waived his right to assert ineffective assistance of counsel claims when he requested to represent himself and signed the *Lopez* waiver form.

Even assuming advisory counsel would have been able to prevent Goodwillie from making some of the mistakes he raises, it is still not reasonably probable that the jury would have reached a different result. Goodwillie admitted during a postarrest interview that he committed the acts underlying many of the charges. The jury took just over an hour and a half to reach its verdicts. Under these circumstances, there is no reasonable probability that there would have been a more favorable result if Goodwillie had been assisted by advisory counsel at trial.

B. *Goodwillie's waiver of his right to be represented by counsel was made with a full understanding of the consequences of the waiver*

Goodwillie maintains that neither the arraigning judge nor the trial judge adequately ascertained that he understood the consequences of representing himself without the assistance of counsel. Goodwillie first contends that at the time he signed the *Lopez* waiver and stated his desire to represent himself at his arraignment, the judge conducted only a "cursory inquiry into [his] ability to represent himself." Goodwillie insinuates that because the arraigning judge was planning to appoint advisory counsel, that judge might not have been sufficiently concerned with ensuring that Goodwillie's waiver of his right to the assistance of counsel was knowing and voluntary.[18]

Goodwillie further contends that in light of the cursory *Faretta* warnings he was given when he first asserted his right to self-representation, the trial judge's failure to provide additional *Faretta* warnings when the judge relieved advisory counsel on February 28, 2005, violated "the spirit and letter of *Faretta v. California.*" We disagree with both of Goodwillie's contentions regarding the validity of his waiver.

1. *The arraignment judge adequately advised Goodwillie about the significance and consequences of his decision to represent himself*

■ "Both federal due process and California law require that waiver of the right to counsel, to be effective, must be with an intelligent appreciation of its consequences. [Citations.]" (*People v. Mattson, supra*, 51 Cal.2d at

---

[18] By stating that the "*Faretta* warnings" he received were given "in the context of appellant receiving appointment of ancillary counsel," Goodwillie suggests that the warnings were somehow stripped of their full significance.

p. 790, fn. 5.) "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Faretta, supra*, 422 U.S. at p. 835.) "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. [Citation.]" (*Godinez v. Moran* (1993) 509 U.S. 389, 401, fn. 12 [125 L.Ed.2d 321, 113 S.Ct. 2680].)

The test for determining whether a waiver of representation is valid "is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citation.]" (*People v. Koontz, supra*, 27 Cal.4th at p. 1070.) The record in this case demonstrates that Goodwillie did understand the disadvantages of representing himself, and that he chose to do so voluntarily.

a. *Goodwillie indicated he had read and understood the contents of the* Lopez *waiver form*

The "record as a whole" in this case includes the *Lopez* waiver form and Goodwillie's confirmation at the August 24, 2004 arraignment that he had discussed the charges against him and the possible sentence with his appointed counsel, and that he had read and understood the waiver form in its entirety. That form set forth most, if not all, of the significant consequences and disadvantages of self-representation. The form, which Goodwillie initialed on each line and signed at the bottom, certified that he waived his right to counsel and that he had been advised as to a number of consequences and disadvantages of waiving that right, including: (1) the lack of wisdom of representing oneself in a criminal case; (2) the penalties and additional consequences of conviction; (3) the fact that the court will not give a self-represented defendant special consideration; (4) the fact that an experienced prosecutor will oppose defendant; (5) the need to comply with all rules of criminal procedure and evidence; (6) the waiver of incompetency of counsel as an issue on appeal; (7) the court's power to terminate self-representation for disruptive behavior; (8) the right, if indigent, to have an attorney appointed at no cost; (9) the fact that no special library privileges will be available; and (10) the fact that the court will not grant extra time for preparing the case for motions or for trial.

Goodwillie complains that the court "conducted no inquiry as to the specific matters in the waiver form, but asked appellant how much schooling

he had completed, . . . whether he could read and write, and . . . whether appellant had any mental problems." However, the record establishes that the court did more than this.

The court asked the attorney who represented Goodwillie at the arraignment whether she was confident, based on her discussions with Goodwillie, that he understood the charged offenses and the maximum punishment. She responded that she was confident that he did. The court then asked Goodwillie if he had read the entire *Lopez* waiver form, to which Goodwillie responded in the affirmative. The court also asked Goodwillie whether he understood "everything on [the form]." Goodwillie again answered in the affirmative. Goodwillie also told the judge that his attorney had answered all of his questions concerning the form. When the court asked Goodwillie if his attorney had informed him of the maximum punishment he was facing, Goodwillie responded, "14 years, 8 months."

The court went through each of the charged offenses with Goodwillie. The court also asked Goodwillie about his level of education, and Goodwillie responded, "I graduated high school and two years [of] college." Goodwillie informed the judge that he could read and write, and that he was not suffering from mental problems or "other infirmities."[19]

### b. *The arraigning judge orally advised Goodwillie about the consequences of representing himself*

In addition to the advisements provided in the *Lopez* waiver form, the arraigning judge spoke with Goodwillie about some particular consequences of a decision to represent himself. The court said to Goodwillie, "You understand that if you're allowed to represent yourself, you're not going to be entitled to any special treatment. You're going to be held to the same standards as any attorney representing himself; right?" Goodwillie indicated that he understood. The court then told Goodwillie, "You're going to be going up against somebody from the D.A.'s office, somebody who's an experienced attorney. Notwithstanding that, do you still wish to represent yourself?" Goodwillie again answered in the affirmative. The court also informed Goodwillie that he would not receive more law library privileges

---

[19] Goodwillie argues on appeal that the court failed to "ask any questions to ascertain if indeed appellant could read except to ask" if he could do so. According to Goodwillie, he "could have been entirely illiterate and the court would have had no way to know it." We reject Goodwillie's suggestion that the court did not sufficiently inquire into his ability to read. The trial court asked Goodwillie if he had read the form, and Goodwillie responded that he had. The court also asked Goodwillie if he could read, and Goodwillie responded in the affirmative. In light of the fact that Goodwillie also told the court that he had graduated from high school and had completed two years of college, the court could reasonably have concluded that Goodwillie was literate.

than those provided to other individuals who proceed in propria persona, and Goodwillie responded that he understood.

After all of this, the court stated on the record its findings regarding Goodwillie's waiver of representation by counsel: "The court has made an inquiry into the depth, background, training, education. I do find that he's made a voluntary, intelligent and understanding waiver of his right to counsel. He's indicated on the record this afternoon he has read, in its entirety, the *Lopez* waiver form, he understands everything on this form. I'm granting him, at this time, the right to represent himself, and I'm executing the form."

Based on the court's advice regarding the potential dangers and disadvantages of self-representation and Goodwillie's acknowledgment that he understood those consequences and that he also understood the consequences and disadvantages set forth in the *Lopez* waiver form, the record clearly demonstrates that Goodwillie understood the disadvantages of self-representation when he chose to represent himself.

c. *Goodwillie's choice to represent himself was made independently from the issue whether he would have advisory counsel to assist him*

Goodwillie argues that his "choice" was not voluntary because he "wanted ancillary counsel." However, Goodwillie was sufficiently informed about all of the consequences of self-representation. He was informed that he would be expected to follow all of the substantive and procedural rules without help from the judge, and that he would be facing experienced prosecutors who would not go easy on him. There was no mention made of advisory counsel at the time the court discussed with Goodwillie the *Lopez* waiver and the disadvantages of self-representation. Goodwillie was fully informed that the ultimate responsibility for his case would rest with him.[20]

---

[20] The record is unclear as to whether, or when, the arraigning judge discussed with Goodwillie the possibility of appointing advisory counsel to assist him. There is no mention of ancillary or advisory counsel made on the record on the day of the arraignment, when the court discussed self-representation with Goodwillie. However, the predisposition minutes from that day state: "[Defendant] requesting to represent himself-granted[.] Sheriff to provide [defendant] all privileges as to pro pers [and] PCC to provide ancillary counsel." Goodwillie cites to the record from a different hearing at which the court asked him whether he had requested ancillary or advisory counsel, or whether the prior judge had simply ordered that ancillary counsel be provided. Goodwillie responded that he had asked the judge "when we was in court." Goodwillie suggests that the evidence in the record supports his assertion that he must have spoken with the judge about the prospect of the appointment of advisory counsel prior to the arraignment. However, our independent review of the record establishes only that the record is inconclusive as to whether such discussions were conducted, and if so, when they occurred.

Goodwillie reaffirmed his decision to represent himself even after he was made aware that he would no longer be receiving any services from advisory counsel. At the February 28 readiness conference, the trial judge and Goodwillie engaged in the following colloquy:

"The Court: . . . I am going to relieve Mr. Williams of this [*sic*] role as advisory counsel. And if you wish to continue to represent yourself, you certainly may and will be afforded that right. Is that your continuing desire to represent yourself in this case?

"The Defendant: Yes, it is.

"The Court: All right. So noted. And that's your decision even knowing that the court is going to relieve Mr. Williams; is that correct?

"The Defendant: Yes.

"The Court: All right. So noted."

Goodwillie asserts that the record "shows that there was no serious inquiry into whether appellant *actually* understood the significance and consequences of his decision when faced for the first time with the prospect of having to represent himself without the assistance of ancillary counsel." He further argues that "[t]he lack of any *Faretta* warnings on the date that ancillary counsel was removed was aggravated by the cursory nature of the *Faretta* inquiry several months earlier at the initial arraignment." As we have already discussed, at the arraignment, the court sufficiently advised Goodwillie of the significance and consequences of a decision to represent himself. There was no need for the trial court to re-advise Goodwillie or to seek an additional waiver.

2. *The trial court was not required to provide renewed* Faretta *warnings to Goodwillie*

Goodwillie contends that the situation in this case is analogous to that in *People v. Hall* (1990) 218 Cal.App.3d 1102 [267 Cal.Rptr. 494], in which "it was held to have been error when renewed *Faretta* warnings were not given at a late stage of the proceedings." However, the issue in *Hall* revolved around the trial court's failure to advise the defendant of the disadvantages of self-representation at a parole revocation/sentencing hearing that occurred two years after the defendant had been tried and convicted. (*Hall, supra,* 218 Cal.App.3d at p. 1106.) *Hall* stands for the rule that "a *Faretta* hearing must be held on the record to advise the defendant of the disadvantages of not being represented by counsel and to establish a knowing and

intelligent waiver of the right to counsel" before a criminal defendant may represent himself at a "deferred sentencing hearing." (*Ibid.*)

■ Although a parole revocation/sentencing hearing is technically part of the original criminal proceeding, it is distinct in substance. The same cannot be said here. The judge who arraigned Goodwillie adequately advised him of his right to counsel and established that he was waiving that right knowingly and voluntarily. No further waiver was necessary. To rule otherwise would impose on the trial court a duty to give *Faretta* warnings prior to every hearing or proceeding in cases in which the defendant is representing himself. The Sixth Amendment does not require such a rule: " 'While it is true that the Sixth Amendment right to counsel applies at all critical stages of the prosecution, including the sentencing stage, it does not follow that once the assistance of counsel in court has been competently waived, a new waiver must be obtained at every subsequent court appearance by the defendant. A competent election by the defendant to represent himself and to decline the assistance of counsel once made before the court carries forward through all further proceedings in that case unless appointment of counsel for subsequent proceedings is expressly requested by the defendant or there are circumstances which suggest that the waiver was limited to a particular stage of the proceedings.' [Citation.]" (*People v. Crayton* (2002) 28 Cal.4th 346, 362 [121 Cal.Rptr.2d 580, 48 P.3d 1136] (*Crayton*).)[21]

---

[21] Contrary to Goodwillie's suggestion, the Supreme Court's decision in *Crayton* does not assist him. In discussing the decision in *Crayton*, Goodwillie indicates that he recognizes that at least one court has concluded that per se reversal is not necessarily required when a trial court erroneously fails to readvise a defendant and obtain a new waiver of counsel at rearraignment after the preliminary examination. By comparing this case with *Crayton*, Goodwillie implies that this case involves a failure to properly readvise. Apparently believing that this court would view his case as involving error arising from the failure to readvise Goodwillie and obtain an additional waiver at the time the trial judge relieved advisory counsel, Goodwillie seeks to establish that the error here was of greater magnitude than the error in *Crayton*, such that the prejudice rule in *Crayton* should not apply, and that per se reversal is required. However, we disagree with Goodwillie's premise that this case involves an error similar to the error in *Crayton*.

*Crayton* involved a trial court's failure to readvise the defendant and obtain a new waiver of the right to be represented by counsel at the defendant's arraignment in the superior court. (*Crayton, supra*, 28 Cal.4th at p. 360.) The defendant in *Crayton* had already been arraigned in the municipal court. (*Ibid.*) Pursuant to statute, the trial court was required to readvise and obtain a new waiver at the defendant's arraignment in the superior court. (*Ibid.*) "[T]he governing statutes provided . . . that a defendant in felony proceedings shall be advised of the right to counsel on at least two distinct occasions prior to trial: first, when the defendant is brought before a magistrate and advised of the filing of the complaint (§ 859), and second, after the preliminary examination, when the defendant is arraigned in superior court on the information (§ 987)." (*Crayton, supra*, 28 Cal.4th at p. 360.)

The *Crayton* court determined that a trial court's failure to readvise pursuant to statute did not require per se reversal. (*Crayton, supra*, 28 Cal.4th at p. 364.) The court held that the prejudicial effect of such an error is to be evaluated under the *Watson* harmless error test. (*Ibid.*)

C. *The trial court did not violate Goodwillie's Sixth and Fourteenth Amendment rights by excluding the testimony of an eyewitness identification expert*

Goodwillie contends that the trial court violated his due process and Sixth Amended rights by limiting his ability to present his defense. During trial, the court granted the prosecutor's motion to exclude proposed testimony by an eyewitness identification expert whom Goodwillie intended to call as a witness to raise reasonable doubt as to the various witnesses' identifications of him as the perpetrator. Goodwillie asserted at trial, and asserts on appeal, that "in relation to the five charges stemming from the car chase there was no corroborating evidence" and that "the evidence of his guilt rested entirely on eyewitness testimony."

 "A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*).) "Although the high court in *Chambers* [*v. Mississippi* (1973) 410 U.S. 284, 302–303 [35 L.Ed.2d 297, 93 S.Ct. 1038]] determined that the combination of state rules resulting in the exclusion of crucial defense evidence constituted a denial of due process under the unusual circumstances of the case before it, it did not question 'the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.' [Citation.]" (*Cornwell, supra*, 37 Cal.4th at p. 82.)

 The leading California case allowing the introduction of expert testimony concerning eyewitness identification is *People v. McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709] (*McDonald*), overruled in part in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [98 Cal.Rptr.2d 431, 4 P.3d 265]). (*People v. Jones* (2003) 30 Cal.4th 1084, 1112 [135 Cal.Rptr.2d 370, 70 P.3d 359] (*Jones*).) In *McDonald*, the Supreme Court concluded that "[T]he decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial

---

This is because the Supreme Court specifically determined that the Sixth Amendment right to the assistance of counsel does not require that the superior court readvise a defendant of his right to counsel and obtain a waiver at superior court proceedings that occur after the initial arraignment in municipal court. Rather, the requirement that the trial court readvise the defendant and obtain a waiver at the time of the arraignment in superior court derives from statute. (28 Cal.4th at pp. 364–365.)

Because the error about which Goodwillie complains is not based on the trial court's failure to meet a statutory requirement to readvise upon arraignment in the superior court, *Crayton* is inapplicable. That case provides no guidance as to whether the court erred in failing to readvise and obtain another waiver from Goodwillie after the initial arraignment.

court's discretion; . . . 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' [Citation.] We expect that *such evidence will not often be needed*, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability . . . , it will ordinarily be error to exclude that testimony." (*McDonald, supra,* 37 Cal.3d at p. 377, fn. omitted, italics added.) The Supreme Court later restated the rule expressed in *McDonald* as follows: "Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability." (*Jones, supra,* 30 Cal.4th at p. 1112, citing *McDonald, supra,* 37 Cal.3d at p. 376 and *People v. Sanders* (1995) 11 Cal.4th 475, 509 [46 Cal.Rptr.2d 751, 905 P.2d 420] (*Sanders*).)

The trial court's decision to exclude expert testimony on the issue of eyewitness identification did not violate Goodwillie's right to due process. Goodwillie has not established that the proffered expert testimony would have had significant probative value in this case. (See *Cornwell, supra,* 37 Cal.4th at p. 82 [excluded evidence was not so vital to the defense that due process principles required its admission].) Specifically, the trial court's ruling did not prevent Goodwillie from presenting a defense that the eyewitnesses were mistaken in their identification of him. He was able to cross-examine the eyewitnesses and challenge the accuracy of their identifications. Further, the court instructed the jurors as to the factors they could consider when weighing the credibility of eyewitness testimony.[22] Most important, there

---

[22] The court instructed the jury with CALJIC No. 2.92. That instruction provided: "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following:

"The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

"The stress, if any, to which the witness was subjected at the time of the observation;

"The witness' ability, following the observation, to provide a description of the perpetrator of the act;

"The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;

"The cross-racial or ethnic nature of the identification;

"The witness' capacity to make an identification;

"Whether the witness was able to identify the alleged perpetrator in a photographic lineup;

"The period of time between the alleged criminal act and the witness' identification;

"Whether the witness had prior contacts with the alleged perpetrator;

"The extent to which the witness is either certain or uncertain of the identification;

"Whether the witness' identification is in fact the product of his or her own recollection; and

"Any other evidence relating to the witness' ability to make an identification."

were at least four witnesses who positively identified Goodwillie as the driver of the silver Chrysler on the day in question. (See *Sanders, supra,* 11 Cal.4th at p. 509 [contrasting "strong and unequivocal" eyewitness testimony in that case, consisting of three eyewitnesses who identified the defendant in lineups and at trial and a fourth who was " 'pretty certain' " of her identification of the defendant at a videotape lineup and positive at trial, with equivocal eyewitness identification in *McDonald,* which included one eyewitness who asserted that the defendant was definitely not the perpetrator].)

There was also other evidence in this case that corroborated the eyewitness testimony, thus meeting the *McDonald* standard. (*Jones, supra,* 30 Cal.4th at p. 1112.) Goodwillie confessed to Detective Escobedo that he had been driving the silver Chrysler and that he had attempted to crash through the police barrier because at that point he realized the car he was driving was probably stolen and he did not want to go to jail.[23] Goodwillie also admitted to Escobedo that when he saw the lights of the patrol car and heard the sirens, he attempted to escape. Goodwillie minimizes the impact of this evidence, arguing that "there was no independent evidence to corroborate those identifications [made by witnesses to the car chase], except Detective Escobedo's testimony that appellant admitted crashing the Chrysler to him." Goodwillie fails to recognize that his admitting the acts underlying the crimes charged constitutes strong corroborating evidence that gives the eyewitness identifications independent reliability.

There was additional independent corroborating evidence presented in this case as well. Goodwillie was apprehended shortly after the driver of the Chrysler fled the scene by jumping over fences and running through a mobilehome park. At the time of his apprehension, Goodwillie had numerous scratches on his arms and legs. Deputy Marquez, who had been pursuing the suspect and had jumped over the same fences as the suspect, testified that he suffered some scratches to his left hand during the pursuit. Upon apprehending Goodwillie, the officers collected clothing found in the apartment with Goodwillie. The back of a shirt the officers found "had some moisture on it" and there were three holes in the front. The shirt also had "some black oil-based substance" on it that appeared to be the same type of oil Deputy Marquez had gotten on his hands when he jumped over one of the iron fences while chasing the suspect.

The cumulative corroborative effect of the unequivocal eyewitness testimony, Goodwillie's admissions, and this additional corroborating evidence is sufficient to give independent reliability to the eyewitnesses' identifications. "Under these circumstances . . . we defer to the conclusion of the trial court

---

[23] Goodwillie stated at that time that his friend, Tyrone Brown, had given him the car to drive.

that the probative value of the testimony in assisting the trier of fact . . . outweighed . . . its 'prejudicial effect . . . .' " (*Sanders, supra,* 11 Cal.4th at p. 510.)

Goodwillie contends that a recent decision of the United States Supreme Court supports his contention that the trial court's exclusion of expert testimony regarding eyewitness identification violated his constitutional right to a meaningful opportunity to present a complete defense, and casts doubt on the authority cited above, citing *Holmes v. South Carolina* (2006) 547 U.S. 319, 321 [164 L.Ed.2d 503, 126 S.Ct. 1727, 1729] (*Holmes*). In *Holmes,* the Supreme Court addressed "whether a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." (*Ibid.*)

The defendant in *Holmes* sought to introduce evidence that another man had attacked the victim, proffering at a pretrial hearing the testimony of several witnesses who placed the other man in the victim's neighborhood on the morning of the assault, and the testimony of four additional witnesses who testified at the pretrial hearing that the other man had proclaimed the defendant's innocence or had admitted to having committed the crimes. (*Holmes, supra,* 547 U.S. at p. 323 [126 S.Ct. at p. 1730].) The trial court excluded the defendant's evidence of third party culpability, concluding that such evidence was admissible if it " ' "raise[s] a reasonable inference or presumption as to [the defendant's] own innocence" ' but is not admissible if it merely ' "cast[s] a bare suspicion upon another" ' or ' "raise[s] a conjectural inference as to the commission of the crime by another." ' [Citation.]" (*Id.* at p. 324 [126 S.Ct. at p. 1731].)

The South Carolina Supreme Court affirmed, holding that " 'where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence.' [Citation.]" (*Holmes, supra,* 547 U.S. at p. 324 [126 S.Ct. at p. 1731].)

The United States Supreme Court explained why this holding was untenable: "Under this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues. [¶] Furthermore, as applied in this case, the South Carolina Supreme Court's rule seems to call for little,

if any, examination of the credibility of the prosecution's witnesses or the reliability of its evidence." (*Holmes, supra,* 547 U.S. at p. 329 [126 S.Ct. at p. 1734].)

In considering whether the South Carolina evidentiary rule violated the Constitution, the United States Supreme Court stated, " 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." ' [Citation.] This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or "disproportionate to the purposes they are designed to serve." ' [Citation.]" (*Holmes, supra,* 547 U.S. at pp. 324–325 [126 S.Ct. at p. 1731].)

The court ultimately concluded that South Carolina's rule of evidence pertaining to third party culpability was "arbitrary": "[B]y evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is 'arbitrary' in the sense that it does not rationally serve the end that the *Gregory* rule and other similar third party guilt rules were designed to further. Nor has the State identified any other legitimate end that the rule serves. It follows that the rule applied in this case by the State Supreme Court violates a criminal defendant's right to have ' "a meaningful opportunity to present a complete defense." ' [Citation.]" (*Holmes, supra,* 547 U.S. at p. 331 [126 S.Ct. at p. 1735].)

We do not read *Holmes* to require a result different from the result we would reach under California precedent relating to the admission or exclusion of eyewitness identification expert testimony. Unlike the defense that the defendant in *Holmes* was prevented from presenting, the defense Goodwillie contends he was prevented from fully presenting appears to be one of mistaken identity. Goodwillie was not prevented from presenting that defense to the same extent as the defendant in *Holmes* was prevented from presenting evidence of third party culpability. In *Holmes,* the defendant wanted to establish that a particular third party may have committed the offense. His only method of doing so was through witness testimony. By not allowing the defendant to call his witnesses, the South Carolina trial court entirely prevented the defendant from presenting his defense. In contrast, while Goodwillie was not allowed to present expert testimony regarding the unreliability of eyewitness testimony, he was permitted to cross-examine the eyewitnesses to raise possible problems with their identifications of him. The court's decision to exclude the expert testimony did not prevent Goodwillie

from offering evidence, if such evidence existed, showing that some eyewitnesses failed to identify him as the perpetrator. Thus, the California evidentiary rule regarding expert eyewitness identification testimony did not entirely prevent Goodwillie from presenting a defense of mistaken identification.

The standard for establishing whether it is error to exclude eyewitness identification testimony is different from the standard the South Carolina court used to determine when a defendant would be allowed to present evidence regarding third party culpability. Trial courts in South Carolina applying the rule had concluded that where there was strong evidence of the defendant's guilt (particularly strong forensic evidence), evidence of a third party's culpability did not raise a reasonable inference as to the defendant's innocence, and thus was not admissible. The Supreme Court explained that this type of evidentiary rule is problematic because the trial court does not focus on the probative value or the potential adverse effects of admitting that particular evidence, but rather, looks to see how strong the prosecution's case is. If the prosecution's case is strong enough, then a South Carolina court would exclude a defendant's third party culpability evidence even if that evidence had significant probative value and posed no undue risk of prejudice or confusion of the issues. (*Holmes, supra*, 547 U.S. at pp. 325–326 [126 S.Ct. at p. 1732].) The Supreme Court determined that such a rule violated the Sixth Amendment.

The California rule pertaining to expert testimony regarding eyewitness identification that requires trial courts to examine whether there exists substantial corroborative evidence that lends independent reliability to the eyewitness testimony is not analogous to the evidentiary rule disapproved as "arbitrary" in *Holmes*. First, as discussed above, the California rule does not contemplate the exclusion of direct witness testimony identifying a third party as the perpetrator (the issue in *Holmes*), nor does it preclude the admission of alibi testimony that conflicts with eyewitness identification of the defendant. Additionally, as we have noted, a defendant may cross-examine any eyewitness to point out problems or inconsistencies in that witness's identification of the defendant.

Unlike the South Carolina rule pertaining to evidence of third party culpability, the California rule pertaining to expert testimony regarding eyewitness identification testimony does not ask the court to weigh the prosecution's evidence as to the guilt or innocence of the defendant prior to deciding whether to admit the expert testimony. Rather, the court looks to the body of evidence that corroborates the eyewitness identification, i.e., whether there is substantial evidence tending to show that the eyewitness identification is itself reliable, in order to assess the probative value of the expert witness testimony. If there is substantial evidence showing that the eyewitness

testimony is reliable, the trial court may conclude that the probative value of expert testimony would not outweigh any prejudicial effect caused by potential confusion of the issues and/or the amount of time that would be consumed by such testimony. (See *Sanders, supra,* 11 Cal.4th at p. 510 ["we defer to the conclusion of the trial court that the probative value of the testimony in assisting the trier of fact was outweighed by its 'prejudicial effect involving the amount of time consumed' "].) The Constitution does not prohibit this type of rule. (*Holmes, supra,* 547 U.S. at p. 326 [126 S.Ct. at p. 1732] ["While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"].)

Finally, unlike the rule in South Carolina, California's evidentiary rule regarding eyewitness identification expert testimony does not rely solely on "evaluating the strength of only one party's evidence . . . ." (*Holmes, supra,* 547 U.S. at p. 331 [126 S.Ct. at p. 1735].) For example, in *Sanders,* the Supreme Court mentioned that the defendant presented no alibi defense, suggesting that if the defendant had done so, such evidence would have been considered in determining whether the trial court erred in excluding eyewitness identification expert testimony. (*Sanders, supra,* 11 Cal.4th at p. 509.) Like the defendant in *Sanders,* Goodwillie did not present an alibi defense in this case. Nor did Goodwillie raise challenges to the evidence corroborating the multiple eyewitness identifications. He thus cannot establish that the trial court failed to consider his challenges to the prosecution's evidence. (Cf. *Holmes, supra,* 547 U.S. at p. 329 [126 S.Ct. at p. 1734] ["in evaluating the prosecution's forensic evidence and deeming it to be 'strong'—and thereby justifying exclusion of petitioner's third party guilt evidence—the South Carolina Supreme Court made no mention of the defense challenges to the prosecution's evidence"].)[24]

---

[24] The trial court in *Holmes* made the decision to exclude the defendant's proffered evidence of third party culpability after a pretrial hearing. In contrast, the trial court in this case did not rule on the admissibility of the expert testimony until after the prosecution had presented its case. Goodwillie had the opportunity to formally challenge the prosecution's evidence prior to the court's ruling on the admissibility of the proffered expert testimony, an opportunity that the defendant in *Holmes, supra,* 547 U.S. at pp. 325–326 [126 S.Ct. at p. 1732], did not have.

D. *Goodwillie's due process rights were violated when the trial court and the prosecutor misinformed him as to his eligibility for good conduct credits, causing Goodwillie to refuse the plea offer*

### 1. *Background*

At the February 28, 2005 hearing, Goodwillie, the prosecutor and the judge all discussed a potential plea bargain the People had offered. Goodwillie told the court that he and the prosecutor had been discussing a possible plea bargain, and that he was willing to "sign a deal to 5 and a half right now if she was [*sic*] to offer it to me. I have no strikes. I never had a strike. . . . I talked to her and asked her this several times, and she says, no, due to the stipulation of something I didn't understand, so I just let it be. I've asked her—I told her I would take 5 and a half right now." Goodwillie also said to the judge, "No, I told her I would take 5 and a half. I mean, you know, I would still have the strikes. *If it can be stricken, you can give me half, and that's what I would ask.*" (Italics added.)

The prosecutor then engaged in the following colloquy with the judge:

"Ms. Worden: He doesn't understand that—he wants to do 50 percent instead of the 80 percent. And I was trying to convey to him that it's not—or 85 percent. Excuse me.

"The Court: 85.

"Ms. Worden: It's 85 percent. I was trying to convey to him that that's not an option. You can't give somebody, you know, 'I'll give you 50 percent.' And I said I would go and even ask him if that deal was still on the table. But it would never be on the table. You can't do 50 percent.

"The Court: All right. So in your talking, at least in terms of the prior readiness plea to counts 2 and 5, each and both of those would be qualifying strikes, right?

"Ms. Worden: It was count 2 and count 5, your honor.

"The Court: Right. So each of those is a qualifying serious felony or a strike, right?

"Ms. Worden: Yes.

"The Court: So if you pled out that way, Mr. Goodwillie, you'd have two strikes on your record and there's no way that you would qualify for 50 percent credit."

Goodwillie attempted to negotiate a different deal, but the court stopped him and asked the prosecutor to go find out what the "last best offer" was so that Goodwillie and the prosecutor could try to reach a "meeting of the minds." The prosecutor indicated that she had to check with someone else to find out what deal, if any, was still available to Goodwillie.

After a brief recess, the prosecutor extended to Goodwillie an offer that had previously been made to him. The prosecutor stated, "Your honor, I spoke with Mr. Mendez. Mr. Mendez said for this morning only he will hold open the offer that was made at the readiness conference, which is count 2 and count 5, and stipulate to 5 years, four months, which is the mid-term on both of those, and then the people would be striking the prison priors. Mr. Goodwillie has three prison priors."

After clarifying that the other charges would be dismissed, the court responded, "All right. So that would, then, for Mr. Goodwillie's benefit and full understanding, mean that if he were to accept that offer, he would acquire two serious felony convictions and/or violent felony convictions on his record. *That is to say, two qualifying strikes, correct? . . .* [¶] *. . . That would also mean that that stipulated sentence legally would have to be served out at 85 percent, meaning a maximum of 15 percent credits against that sentence, correct?*" (Italics added.) The prosecutor replied, "Yes, your honor."

The court then asked Goodwillie if he wished to accept or reject the offer. Goodwillie responded, "I'm going to reject it."

At the sentencing hearing, after Goodwillie had been tried and convicted, the trial court realized that Goodwillie would in fact be eligible to receive 50 percent credit, even after having been convicted on all of the counts.[25] The court stated:

"The Court: Parenthetically, for clarity of the record, the court does not view this case or any of these offenses as being on[es] that restrict the accumulation of credits under 2933.1. That is to say, the court agrees with the probation officer's analysis in that regard, that Penal Code section 4019 does apply and that you can legally accrue credits within the Department of Corrections of up to 50 percent as against the sentence to be imposed. That's not to say that you will necessarily be in a position to achieve one for one credits, but there will be no legal bar to your doing so.

"Mr. Goodwillie: And I do this time or 80 or 85?

"The Court: No. In this case you can do the time at as little as 50 percent."

---

[25] Under the plea agreement, some of the counts would have been dismissed.

The prosecutor was still under the impression that Goodwillie would have to serve at least 80 or 85 percent of the sentence under the "Three Strikes" law. When asked whether she disagreed with the court's analysis of Goodwillie's eligibility for credit, the prosecutor replied, "We actually were just discussing it. I wasn't sure. We were going to go look it up when I got up. I thought because of the nature of the three strikes, just being a serious felony it had to be served at either 80 or 85 percent."

The court then clarified its view of the matter: "No. I've looked at 2933.1 in the context of this particular case because I was concerned about that question, and it has to be an offense that is otherwise delineated and set out in the 667.5 (c), and none of the offenses in this case are. So I'm confident that this is a 4019 case in which legally Mr. Goodwillie can earn up to one for one credit."

The court and the prosecutor were thus mistaken when they informed Goodwillie prior to trial that he would not be eligible to receive 50 percent credit.

## 2. *Analysis*

The trial court correctly determined prior to sentencing that Goodwillie would be eligible to receive 50 percent conduct credits. However, at the time Goodwillie was deciding whether to accept the offer of five years four months, the court and the prosecutor mistakenly informed him that he *would not* be eligible for 50 percent credits, and instead would have to serve, at a minimum, 85 percent of his sentence. Goodwillie contends that the trial court and the prosecutor had a duty to provide him with correct information regarding the consequences of the offered plea agreement, and that by misinforming him, the court and the prosecutor caused him to reject a plea offer he would have otherwise readily accepted.

We conclude that the court and the prosecutor had a duty not to misinform Goodwillie as to his potential eligibility for 50 percent conduct credits. We further conclude that their providing Goodwillie with inaccurate information on this matter prejudiced Goodwillie in that it caused him to reject an offer that was more favorable to him than the sentence he received after trial, and deprived him of the opportunity to reach any other plea bargain.

Goodwillie claims that the fact that the court and the prosecutor provided him with incorrect information as to the consequences of a guilty plea violated his right to due process. This type of claim typically arises in the context of a claim of ineffective assistance of counsel. Cases involving allegations of ineffective assistance of counsel with respect to advising the

defendant to accept or reject a plea bargain thus provide a useful framework for considering Goodwillie's assertions.

■ In cases involving plea bargains that the defendant has accepted, reversal is generally required only if the court fails to inform the defendant of information that makes the plea bargain *less attractive* than it appeared to be without the omitted information. (See *People v. Cortez* (1997) 55 Cal.App.4th 426, 430 [64 Cal.Rptr.2d 71], citing *People v. Hellgren* (1989) 208 Cal.App.3d 854, 858 [256 Cal.Rptr. 465].) Extending that concept to the reverse situation where, as here, a defendant rejects the plea bargain and is subsequently convicted, reversal may be required if the omitted information makes the bargain more favorable to the defendant than it appeared to be without the information.

In *In re Alvernaz* (1992) 2 Cal.4th 924, 928 [8 Cal.Rptr.2d 713, 830 P.2d 747] (*Alvernaz*) the Supreme Court examined the defendant's contention that he rejected a plea agreement that was more favorable to him than the outcome of his trial, due to ineffective assistance of counsel. The court summarized its resolution of the issue in this way: "In this case we must decide under what circumstances, if any, a criminal defendant who rejects an offered plea bargain prior to trial and thereafter is convicted and receives a sentence less favorable than the terms of the offer, may challenge that conviction and sentence on the ground of ineffective assistance of counsel in the decision to reject the offered plea bargain. [¶] As we shall explain, we conclude, in conformity with the decisions of the federal and state courts that have addressed the issue, that when a defendant demonstrates that ineffective representation at the pretrial stage of a criminal proceeding caused him or her to proceed to trial rather than to accept an offer of a plea bargain that would have been approved by the court, the defendant has been deprived of the effective assistance of counsel guaranteed by the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution, even if the defendant thereafter receives a fair trial. We also conclude that when a defendant has established that such a constitutional violation has occurred, the appropriate remedy is either modification of the judgment consistent with the terms of the offered plea bargain, or a new trial with resumption of the plea negotiation process."

■ In this case, it was not Goodwillie's counsel who misadvised him regarding the terms of the plea agreement, but rather, the trial court and the prosecutor. Although a propria persona defendant is responsible for informing himself regarding the substantive and procedural law at issue in his case, the court and the prosecutor, as officers of the court, have a duty not to misstate

the law, whether intentionally or not.[26] By misinforming Goodwillie as to the consequences of the proffered plea bargain, the court and the prosecutor caused him to reject an offer that was more favorable to him than the result after trial, and one that he had indicated a willingness to accept.[27]

The Attorney General suggests that the prosecutor might have withdrawn the offer if the prosecutor had realized during the plea negotiations that Goodwillie would be eligible to receive 50 percent good behavior credit, rather than 15 percent. On this basis, the Attorney General challenges whether there was in fact a firm offer extended to Goodwillie that was more favorable to him.

The misunderstanding on the part of the trial court and the prosecutor as to what percent of Goodwillie's sentence he would have to serve before he would be eligible for parole, and their misinforming Goodwillie as to that issue, induced Goodwillie to reject the offer that was made and to take his case to trial. Even if the prosecutor would have revoked the offer if she had realized that Goodwillie's credit eligibility was other than what the prosecutor and the judge understood it to be, it is likely that plea negotiations would have continued if the prosecutor and Goodwillie had not been under the misimpression that Goodwillie would have to serve 85 percent of any sentence he received.[28] The trial court and the prosecutor's misunderstanding brought the plea bargaining process to a halt, and thus prevented Goodwillie from obtaining a plea offer more favorable to him than the sentence he received after trial. This violates notions of fundamental fairness assured by the due process clause of the Fourteenth Amendment. (See *California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 104 S.Ct. 2528].)

---

[26] We do not intend to suggest that either the trial judge or the prosecutor intentionally misinformed Goodwillie about the consequences of the plea offer. The record demonstrates the opposite. It appears that the court and the prosecutor were simply mistaken as to the percentage of good conduct credits Goodwillie would be eligible to receive under the terms of the plea offer. However, the impact on Goodwillie is the same.

[27] The Supreme Court has concluded that a trial court's failure to advise a defendant of the collateral consequences of entering into a plea bargain, such as his eligibility for parole under the Three Strikes law, does not entitle a defendant to withdraw his guilty plea. (See *People v. Barella* (1999) 20 Cal.4th 261, 265 [84 Cal.Rptr.2d 248, 975 P.2d 37].) However, the holding in *Barella* does not apply in this situation because the trial court in *Barella* did not affirmatively *misinform* the defendant as to his eligibility for parole. Rather, the court simply failed to inform the defendant that he would be required to serve at least 80 percent of his sentence as a result of the Three Strikes law, rather than the usual 50 percent. (20 Cal.4th at p. 265.) Here, the trial court and the prosecutor provided Goodwillie with incorrect information that was directly related to an issue with which he was concerned during the plea bargaining process, namely, when he might be eligible for parole as a result of good conduct.

[28] It is not at all clear that the district attorney would in fact have revoked the offer upon finding out that Goodwillie would be eligible to receive 50 percent credit. At oral argument, counsel for the Attorney General conceded that the prosecutor might have stood by the offer made to Goodwillie, regardless of his good behavior credit eligibility.

Because we have concluded that the trial court's error violated Goodwillie's right to due process, the standard for assessing the prejudice to Goodwillie is that stated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (See, e.g., *People v. Scheller* (2006) 136 Cal.App.4th 1143, 1152 [39 Cal.Rptr.3d 447] [error implicating due process requires "federal 'beyond a reasonable doubt' standard" of *Chapman*].) *Chapman* provides that federal constitutional error requires reversal unless the People can prove that the error was harmless beyond a reasonable doubt. (*People v. Scheller, supra*, 136 Cal.App.4th at p. 1152.) The People have not made such a showing. In fact, the evidence establishes that Goodwillie was prejudiced.

Goodwillie can clearly establish that he would have accepted the plea offer that was made if he had been accurately advised of his credit eligibility. He stated on the record that he was willing to accept five and a half years if, under the terms of the offer, he could receive 50 percent credit. The offer was five years four months. Further, there is evidence in the record that suggests that the trial court would have approved that plea bargain. The court was engaged in the plea negotiations at the time the offer was made. During that process, the court did nothing to suggest that the court would not approve the proffered plea deal. In fact, the court's comments in presenting the offer to Goodwillie indicate that if Goodwillie were to have accepted the offer, the court would have implemented the terms of the offer. The court said, "So if you pled out that way, Mr. Goodwillie, you'd have two strikes on your record, and there's no way that you would qualify for 50 percent credit." Implicit in the court's statement is that if Goodwillie were to accept the terms of the offer, the court would approve it, and certain consequences would follow. The court suggested that if the parties could agree, there would be no need for a trial: "And if we can reach a meeting of the minds, wonderful. If not, we're going to continue the trial date and Mr. Williams will be out of the picture." The court never indicated that it would be unwilling to approve an offer of five years four months, by which Goodwillie would have been eligible for 50 percent credit rather than 85 percent credit. Rather, the court's concern with the percentage of credit Goodwillie would be eligible to receive appeared to relate only to whether Goodwillie adequately understood the consequences of the proposed agreement.

With respect to the suggestion that there may not have been a firm offer that Goodwillie would have accepted because the prosecutor might have revoked the offer if she had not been under the misimpression that he would be required to serve at least 85 percent of his sentence, as discussed above, the prejudice to Goodwillie goes beyond being deprived of the specific plea offer of five years four months. The harm that the error caused Goodwillie includes the prevention of any further plea negotiations that might have otherwise taken place. If a different plea agreement might have been reached,

but was not because the judge and the prosecutor labored under a misunderstanding as to Goodwillie's eligibility for good behavior credits, Goodwillie was prejudiced. The People have not demonstrated beyond a reasonable doubt that a plea agreement more favorable to Goodwillie than the sentence he received after trial would not have been reached in the absence of the error, either in the form of the original offer, or a different but still more favorable offer made with Goodwillie's actual credit eligibility in mind.

Because the People have not established beyond a reasonable doubt that the error did not prejudice Goodwillie, the next question is what remedy is appropriate in this situation. Like the defendant in *Alvernaz*, Goodwillie seeks specific performance of the plea bargain that was previously offered. In rejecting the appellant's request that the court order specific performance of the plea bargain previously offered him, the *Alvernaz* court noted that, "California courts . . . generally disfavor the remedy of specific enforcement of a failed plea agreement when 'specifically enforcing the bargain [will limit] the judge's sentencing discretion in light of the development of additional information or changed circumstances between acceptance of the plea and sentencing.' " (*Alvernaz, supra*, 2 Cal.4th at p. 942, quoting *People v. Mancheno* (1982) 32 Cal.3d 855, 861 [187 Cal.Rptr. 441, 654 P.2d 211], and citing *People v. Calloway* (1981) 29 Cal.3d 666 [175 Cal.Rptr. 596, 631 P.2d 30] ["ordering specific performance would prevent the trial court from exercising its sentencing discretion"].) The *Alvernaz* court further noted that in *Mabry v. Johnson* (1984) 467 U.S. 504 [81 L.Ed.2d 437, 104 S.Ct. 2543], the United States Supreme Court held that the federal Constitution does not bar the prosecution from withdrawing an offered plea bargain, even after the defendant has accepted it, explaining, " 'A plea bargain standing alone is . . . a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest.' " (*Alvernaz, supra*, 2 Cal.4th at p. 943, quoting *Mabry, supra*, 467 U.S. at p. 507.)

Based on the holdings in these cases, the *Alvernaz* court determined that "where ineffective assistance of counsel causes a defendant to reject the offer of a plea bargain, the remedy of specific enforcement of the plea offer following trial and conviction is neither constitutionally compelled nor consistent with the exercise of the trial court's broad discretion in determining the appropriate sentence for a defendant's criminal conduct." (*Alvernaz, supra*, 2 Cal.4th at p. 943.) For many of the reasons cited by the court in *Alvernaz* for rejecting the imposition of specific performance of the plea bargain, we too decline to require the prosecution to follow through with the specific plea bargain that was offered and rejected. Rather, we take guidance from the Supreme Court's disposition in *Alvernaz* in fashioning an appropriate remedy.

■ The *Alvernaz* court concluded: "[T]he appropriate remedy for ineffective assistance of counsel that has resulted in a defendant's decision to reject an offered plea bargain (and to proceed to trial) is as follows: After the granting of relief by the trial court (on a motion for new trial or in a habeas corpus proceeding) or by an appellate court, the district attorney shall submit the previously offered plea bargain to the trial court for its approval, unless the district attorney within 30 days elects to retry the defendant and resume the plea negotiation process. If the plea bargain is submitted to and approved by the trial court, the judgment shall be modified consistent with the terms of the plea bargain." (*Alvernaz, supra*, 2 Cal.4th at p. 944.)

The Supreme Court recognized that the remedy it devised in *Alvernaz* "does not return the parties to the status quo ante if the district attorney elects to resume the plea negotiation process or to proceed to trial" because "[u]pon resumption of plea negotiations, the prosecution has acquired as substantial bargaining leverage the circumstance of having obtained a conviction of the defendant following a trial." (*Alvernaz, supra*, 2 Cal.4th at p. 944.) However, the court rejected the idea that affording the defendant the right to a new trial leaves the defendant with an " 'empty' remedy." (*Ibid.*) The court concluded that a "defendant is in a better position, in preparing for a new trial following trial and conviction, to evaluate the strengths and weaknesses of both the prosecution's case and the defense's case." (*Ibid.*) Additionally, the defendant "is restored the bargaining leverage often afforded by the prosecutor's desire to avoid the time and expense of a new trial and the accompanying uncertainty as to the outcome of the proceedings." (*Ibid.*)

The rule the Supreme Court devised to remedy the "ineffective assistance of counsel that has resulted in a defendant's decision to reject an offered plea bargain" (*Alvernaz, supra*, 2 Cal.4th at p. 944) should similarly apply to remedy the denial of due process attributable to a source other than defense counsel that has deprived the defendant of the opportunity to enter into a plea bargain.

IV.

DISPOSITION

The judgment is vacated and the case is remanded to the trial court. On remand, the district attorney may elect, within 30 days of the issuance of the remittitur, to: (1) submit the previous offer of five years four months to the trial court for its approval; or (2) set the case for retrial and, if the district attorney so chooses, resume the plea negotiation process. If the district attorney chooses to submit the previously offered plea bargain to the court

and the court approves the plea bargain, the judgment shall be modified consistent with the terms of the plea bargain and as so modified, reinstated.

Huffman, Acting P. J., and O'Rourke, J., concurred.