Filed 4/4/13  P. v. Obannon CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037481 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. BB943129) |
| v. | |
| VINCENT EARL OBANNON, | |
| Defendant and Appellant. | |

In this appeal, Vincent Obannon (appellant) challenges the denial of his motion to reconsider a *Romero* ruling,[1] argues the lower court erred in ordering him to pay direct victim restitution to Best Buy in the amount of $2,643.36, and contends, on equal protection grounds, that he is entitled to increased presentence custody credits under the current version of Penal Code section 4019.  For reasons that follow, we agree that the restitution order to Best Buy cannot stand.  Accordingly, we will strike the order.  As so modified, the judgment is affirmed.

### *Facts and Proceedings Below*

We take the facts from the probation officer's report in this case.  In turn, those facts were derived from Mountain View Police case number 09-005642 reports.

---

[1]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

*Counts One and Two*

On August 1, 2009, appellant went into two Beverages and More stores and attempted to use an altered credit card in each store to purchase a bottle of tequila valued at $81.99 and two $500 gift cards. At both stores the clerks expressed suspicion about the transactions and appellant grabbed the card and left the stores without the merchandise.

*Count Three*

On August 22, 2009, appellant entered another Beverages and More store and filled out an application for a "BevMo" card. Thereafter, he purchased a bottle of tequila valued at $81.99 with cash. After purchasing the tequila he attempted to purchase two $500 gift cards. Since the numbers on the credit card did not match the numbers on the receipt, appellant was not permitted to purchase the gift cards. He took the credit card and left the store. After this incident, the store clerk sent an email alert to other Beverages and More stores.

*Count Four*

On June 19, 2009, appellant entered the Blossom Hill Beverages and More store and purchased three $500 gift cards using an altered credit card. Officers were not able to locate the owner of this card.

*Counts Five and Six*

On May 9, 2009, using the name Anthony Young, appellant purchased an Apple Macbook and accessories using a stolen credit card belonging to Gilgent Peng. The total for the purchase was $2,643.56. The purchases were made at a San Francisco Best Buy store. Shortly thereafter, appellant made a $30.77 purchase at an Olympian gas station.

During the course of an investigation into these incidents police discovered that when appellant applied for the BevMo card, the social security number used belonged to

2

both appellant and Anthony Young. A record check revealed that appellant was a sex offender and on parole for identity theft.

Police contacted appellant's parole officer and requested GPS tracking information; the GPS tracking information revealed that appellant was at Best Buy, the Olympian gas station and at each of the Beverages and More stores on the dates of, and within minutes of, the fraudulent transactions.

Appellant was arrested on September 10, 2009, at the office of his parole officer. During a search of appellant's wallet, officers found a folded piece of paper on which were listed the items required to make a counterfeit credit card. After being given *Miranda* advisements,[2] appellant said that he had information on an ongoing decade old "operation,"[3] but refused to provide more details without some assurance that his charges would be reduced.

On January 21, 2011, the Santa Clara County District Attorney filed an information in which appellant was charged with five felony counts of second degree burglary (Pen. Code, § 459, 460, subd. (b), counts one through five) and one count of using Gilgent Peng's personal identifying information without authorization. (§ 530.5, subd. (a), count six).[4] The information contained allegations that appellant had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) and had served three prior prison terms within the meaning of section 667.5, subdivision (b).

On June 6, 2011, appellant entered an open plea[5] of guilty to all counts and admitted each of the prior conviction and prior prison term allegations.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[3]     Although the probation officer's report does not provide more details, we assume that the operation to which the report refers was a counterfeiting operation.

[4]     All unspecified statutory references are to the Penal Code.

[5]     An open plea is one under which a defendant is not made any promises in exchange for entering his plea. (*People v. Williams* (1998) 17 Cal.4th 148, 156.)

On July 25, 2011, appellant filed a motion pursuant to *Romero*, *supra*, 13 Cal.4th 497, asking the court to strike his two prior strike convictions for purposes of sentencing him. On August 22, 2011, the court (Judge Southard) denied the motion as to count one, but granted the motion to dismiss both the prior strike convictions as to counts two through six.[6] The court dismissed the three prior prison term allegations. The court indicated that appellant's sentence would be 28 years, four months in state prison; the court stated that it was willing to go forward with sentencing immediately. On the request of defense counsel the matter was continued for sentencing. Judge Southard informed appellant that he would soon be retiring and sought appellant's waiver of his right to be sentenced by him, which appellant gave.

Subsequently, it appears that appellant asked Judge Kumli, to whom the case had been assigned, to reconsider Judge Southard's *Romero* ruling. On October 17, 2011, Judge Kumli made a record of prior off the record matters. According to Judge Kumli, the parties had met on September 16th to discuss the case and the matter was continued, over the People's objection, for appellant to provide additional information; Judge Kumli went on to say that "the ruling of the *Romero* hearing was in the estimation of this Court binding upon this Court, and that the indicated sentence given by Judge Southard back on August 22nd would be imposed." Judge Kumli went on to say that the matter was back before the court for the third time for imposition of sentence.

Accordingly, after noting that the court had read and considered the probation officer's report and supplemental declarations, which had been submitted in support of striking the serious felony priors, the court sentenced appellant to 28 years four months to life in state prison.[7] The court calculated appellant's presentence custody credits at 768

---

[6]    Without the dismissal of the prior strike conviction allegations as to counts two through six, appellant faced a prison term of 150 years to life.

[7]    The court denied another request from defense counsel to continue the matter so that she could submit more documentation to the court.

actual days plus 384 days of conduct credits for a total of 1152 days. Relevant to this appeal, the court ordered that appellant pay $2,643.36 to Citibank *and* to Best Buy.

Appellant filed a notice of appeal the same day he was sentenced.

*Discussion*

*Failure to Reconsider the Romero Motion*

Appellant contends that the lower court abused its discretion and violated due process when Judge Kumli concluded that he had no authority to re-open the *Romero* motion in light of "relevant new evidence."

The "new evidence" to which appellant refers consists of a letter from a Ms. Victoria Shepard, the sister of the mother of appellant's children, a purported affidavit from the mother of appellant's children—Linda Hollingsworth,[8] a letter from Kathy Gordon a former instructor with Milpitas Adult Education at the Elmwood Correctional Facility (Elmwood) and a letter from appellant.

As noted Judge Kumli stated that "the ruling of the *Romero* hearing [is] . . . binding upon this Court." Subsequently, the prosecutor asked Judge Kumli "not just to indicate that [the court] feels bound by Judge Southard's ruling but that's the appropriate ruling under the three strikes law itself as well as the court cases that have interpreted the application of three strikes. And Judge Southard actually stated on the record that unfortunately Mr. Obannon was the poster boy for three strikes and found it sad to say that in light of the fact that Mr. Obannon seemed to be a charming, intelligent man, but that the Court must set aside the sympathy it had for Mr. Obannon and follow the law. And that in [*sic*] Judge Southard's view of the decision to strike the strike of all counts. [¶] So I ask the Court not to only follow the ruling but also to embrace it."

Judge Kumli responded, "All right. Let me be clear. The Court doesn't feel that it needs to editorialize or comment one way or the other with regard to the reasons for the

_____

[8] Although entitled a "General Affidavit" the document is not notarized. It contains only the signature of the affiant—the mother of appellant's children.

5

*Romero* hearing and the ruling of Judge Southard in this case. [¶] I will say that - - and this may be a distinction without a difference, but the Court feels bound to the ruling on the *Romero* motion by Judge Southard . . . ."

Appellant asserts that the lower court erroneously believed that it had no authority to reconsider the *Romero* motion.

Under section 1385, subdivision (a), a "judge . . . may, either on his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." In *Romero, supra*, 13 Cal.4th 497, our Supreme Court held that a trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony, on its own motion, in furtherance of justice pursuant to section 1385, subdivision (a). (*Id*. at p. 504.) The *Romero* court held that a court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is reviewable for abuse of discretion. (*Ibid.*) Similarly, "a court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

We start from the premise that " '[i]t is presumed that official duty has been regularly performed' and scores of appellate decisions, relying on this provision, have held that 'in the absence of any contrary evidence, we are entitled to presume that the trial court . . . properly followed established law.' [Citation.]" (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.)

Accordingly, we must presume that Judge Kumli was aware that the general rule that one superior court judge may not reconsider the previous ruling of another superior court judge is subject to an exception where the first judge is unavailable to decide a motion for reconsideration (*People v. Goodwillie* (2007) 147 Cal.App.4th 695, 713); and that one of the factors to consider in deciding whether to modify another judge's ruling is

6

whether there has been a change in circumstances since the previous order was made. (*People v. Riva* (2003) 112 Cal.App.4th 981, 992.)

The record is at best ambiguous as to whether Judge Kumli refused to reconsider the motion because he believed that he did not have authority so to do, or refused to exercise his discretion under section 1385. We must keep in mind that the law does not require the trial court to specify the reasons for denying a *Romero* motion to strike prior strikes. (*In re Large* (2007) 41 Cal.4th 538, 546, fn. 6.)

It is possible as appellant suggests that Judge Kumli did not believe he had authority to rehear the motion, but it is equally possible that Judge Kumli declined to exercise his discretion under section 1385. We are mindful that "[a] defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 375.)

As noted, "[i]t is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties. (Evid. Code, § 664; [citations].)" (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032.) Accordingly, absent unambiguous evidence to the contrary, that presumption justifies a finding in this case that Judge Kumli knew the scope of the section 1385 discretion available to him and failed to exercise it in appellant's favor because to do so would have been a manifest abuse of his discretion.

Even if we were to assume for the sake of argument that Judge Kumli misunderstood the scope of his discretion in this case, we would not return the matter to the trial court because it would be an abuse of discretion for Judge Kumli to strike the priors as to all counts. (See, *People v. Askey* (1996) 49 Cal.App.4th 381, 389, fn. 3; *People v. DeGuzman* (1996) 49 Cal.App.4th 1049, 1054-1055.)

When Judge Southard made his decision to strike the priors as to count one he made a thorough and detailed record of his decision. Specifically, he noted "With respect to the prior convictions I have to note that the one prior conviction out of San Francisco

7

for rape was particularly onerous.[9] I realize it happened a long time ago. Mr. Obannon was a very young man. I want to point out however . . . since I am talking about proportionality, if that crime had occurred at least in Santa Clara County today he would be looking at virtually life in prison for that offense today, and all these other crimes that have happened in the last 30 years would have never happened, but it happened someplace else at a different time under different circumstances, but it was as severe a strike prior as one can imagine. [¶] Likewise, the other strike prior conviction was also a crime of violence. It was robbery of the standard variety, and it happened while he was literally just out of custody for that other offense. Since that time Mr. Obannon has had virtually no period in which he was not either incarcerated, on parole or on probation. He has done poorly notwithstanding his personal charm and intelligence as one might guess given the kind of record he's consistently fallen back upon crime as a means of supporting himself. [¶] It is [*sic*] great importance to note the fact that the last time he was charged with multiple counts, many counts of identity theft and fraud on virtually the same type of method of operation in this case, he was given the benefit of a two strikes sentence, received an 8 year term and then in this particular case not even two months out of custody on parole he is doing the same thing on a professional criminal level again."[10]

The probation officer's report prepared in this case indicated that appellant's criminal history includes four felony offenses and six misdemeanor convictions for an array of offenses including rape, robbery, second degree burglary and petty theft. Appellant had three parole violations and was on parole at the time of his most current

_____

[9] A copy of the preliminary hearing transcript from the 1981 rape by force was before the court and is in the record. The record shows that during a residential burglary appellant raped a young woman in her home at gunpoint within earshot of her husband, who was being held at gunpoint on the floor a few feet away by a codefendant.

[10] In the case out of Los Angeles County appellant was convicted of one count of second degree burglary (§ 459) one count of identity theft (§ 530.5) and three counts of grand theft of personal property (§ 487, subd. (a)).

offenses.  The probation officer noted that appellant said that he had a substance abuse problem in that he uses drugs to cope with life.[11]

Against this background, the four additional pieces of "evidence" that were presented to the court—a letter from Ms. Shepard—explained that appellant had "grow[n] up without a positive role model" and that he had been held back in his efforts "to provide for himself and his family [due to] social injustices . . . neighborhood violence, a sense of hopelessness, and lack of self-esteem"  Ms. Shepard confirmed that appellant had turned to drugs and she believed that he would be a productive citizen if he were granted leniency and received some community support.

Ms. Hollingsworth wrote that appellant was the father of her two children and he had a long history of drug use.  She confirmed that appellant had been neglected as a child, during which time he had no contact with his father and lost his mother.  Ms. Hollingsworth asserted that appellant's inability to provide for his family had driven him to feel hopeless and that his children hoped the court would give him an opportunity to turn his life around.

The letter from Ms. Gordon the former education instructor at Elmwood explained that in the time appellant was in Elmwood he delved deeply into the jail's substance abuse program and made great strides in understanding his addiction and the poor choices he made as a result.  Ms. Gordon believed that appellant was sincerely remorseful for the pain his actions caused others.  Ms. Gordon pledged to provide appellant housing free of drugs, alcohol and crime.  She offered to assist appellant in obtaining employment and continuing his education toward becoming a drug and alcohol counselor.

Finally, in a letter to the court, appellant stated that he had been taking substance abuse classes while in jail, which he had never had the opportunity to do before, and he

---

[11]    The probation officer's report from appellant's case out of Los Angeles County indicates that appellant denied using or abusing drugs or alcohol.

was seeking mental health treatment. He said he was highly remorseful and vowed to live a productive and crime-free life.

This record establishes that it would have been a manifest abuse of the trial court's limited discretion to strike appellant's prior felony conviction allegations "in furtherance of justice" under section 1385 as to the one count that Judge Southard left intact. As the prosecutor argued in her written motion opposing the original *Romero* motion, "[t]he defendant has simply failed to present a single compelling factor as it relates to his background, character, or prospects, which would justify the exercise of [the court]'s discretion to dismiss his remaining strike prior conviction. As natural as it is to feel some sympathy for the defendant, and the life he has clearly wasted, it would be improper to use this emotion in evaluating the defendant's personal and criminal history, the current offense, and his future prospects."

As our Supreme Court observed in *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*), a case where the defendant was convicted of driving under the influence four times (*id* at p. 152) and had a lengthy criminal history (*id.* at p. 154), " 'the existence of such convictions reveals that [he] had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable -- but had failed or refused to learn his lesson.' " (*Id.* at p. 163.) The defendant in *Williams* had had a substance abuse problem since he was nine years of age; he apparently recognized the fact and stated a desire to change; but he did not follow through in efforts to bring the situation under control. The defendant was unemployed; he lived alone although he had cohabited with a woman for five or six years, and had two children with her, one of whom was disabled; and he wished to receive probation in order to help care for this child. (*Id.* at p. 155.)

The *Williams'* court observed: "there is little favorable about [the defendant]'s background, character, or prospects. We do not ignore the fact that he apparently had had a stable living arrangement with a woman, had expressed a desire to help care for their disabled child, and was still loved, and supported, by his family. But neither can we

10

ignore the fact that he was unemployed and did not follow through in efforts to bring his substance abuse problem under control. Certainly, that he happened to pass about 13 years between his prior serious and/or violent felony convictions and his present felony, and proceeded from about 20 years of age to 32, is not significant. He did not refrain from criminal activity during that span of time, and he did not add maturity to age. Quite the contrary. In those years, he was often in prison or jail; when he was not, he violated parole and, apparently, probation, and committed the offenses that resulted in his convictions . . . ." (*Williams*, *supra*, 17 Cal.4th at p. 163.)

Appellant argues that the letters and affidavits that the defense asked Judge Kumli to consider supported his position that he should not be sentenced to a life term based on his background, character and prospects. Unfortunately, for appellant *Williams* teaches us otherwise.

By this court's calculation appellant has spent the majority of the last 31 years incarcerated and/or on parole. Significant by its absence is any conviction for a drug offense.

Regardless of the trial court's beliefs in its authority to strike the alleged prior felony convictions, appellant has suffered no prejudice. It would have been a manifest abuse of the court's discretion to have exercised it on this record.

*Direct Victim Restitution to Best Buy*

As noted, in sentencing appellant, the court ordered that appellant pay direct victim restitution of $2,643.36 to Citibank *and* to Best Buy. Specifically, the court ordered appellant "to pay restitution in an amount including but not limited to $2,643.36 Citibank" and "to pay restitution including but not limited to . . . $2,643.36 to Best Buy."

Appellant argues that the lower court erred in ordering him to pay direct restitution to Best Buy without any evidence to support the order.

Section 1202.4, subdivision (f), states in relevant part, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall

11

require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."

"A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious.  [Citation.]  No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered."  (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542 (*Gemelli*).)  The trial court may consider almost any kind of information in calculating restitution.  (*People v. Phu* (2009) 179 Cal.App.4th 280, 283–284.)  " 'Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.  [Citation.]' [Citation.]"  (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045.)  " 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be overturned when the circumstances might also reasonably support a contrary finding." (*People v. Baker* (2005) 126 Cal.App.4th 463, 469 (*Baker*); see also *Gemelli*, *supra*, 161 Cal.App.4th at p. 1542.)  In reviewing the evidence, we do not reweigh or reinterpret it; we determine only whether there is sufficient evidence to support the inference drawn by the trier of fact.  (*Baker*, *supra*, 126 Cal.App.4th at p. 469.)

Appellant points out that the probation officer's report includes the following information concerning restitution to Best Buy and Citibank.

"On July 7, 2011, this officer contacted Best Buy and spoke to the store operation manager, Joey I., who indicated he does not know if Best Buy suffered any losses.  The company's bookkeeping system can only go back to the last fiscal year.  He stated he would contact this officer if he had additional information.  Should any information be received prior to sentencing, it will be forwarded to Court.  According to the police report, the defendant successfully obtained $2,643.36 in merchandise.  This amount is recommended pending further information.  [¶]  On June 30, 2011, this officer contacted Citibank fraud investigator, Diana Lindstrom who indicated Citibank representatives will

12

not attend sentencing. She indicated Citibank reimbursed victim Peng for the fraudulent charges, but she did not indicate reimbursing the two victim business[es], Best Buy or Olympian. They are requesting restitution in the amount of $2,643.36, which is recommended. [¶] This officer attempted to contact victim Peng at the telephone number[s] listed in the police report; however, one of the number[s] is no longer in service and the other number no longer belongs to the victim."

After the court ordered appellant to pay $2,643.36 to Citibank and Best Buy and finished imposing other fines and fees, the prosecutor asked the court, "with respect to the restitution order of 2,643.36, could the Court order that to Citibank? There was a specific request from Citibank who had indicated to probation that they reimbursed victim [Peng] for the charges." The court responded, "That order will be submitted at this time. That restitution in that matter will be paid directly to Citibank."

Both the minute order from the sentencing hearing and the abstract of judgment reflect that appellant is to pay $2,643.36 to Citibank and to Best Buy.

Respondent asserts appellant has forfeited any challenge to the restitution order by failing to challenge it below. In support of this assertion respondent cites to *People v. Brasure* (2008) 42 Cal.4th 1037.

However, as this court explained in *In re K. F.* (2009) 173 Cal.App.4th 655, "Sufficiency of the evidence has always been viewed as a question necessarily and inherently raised in every contested trial of any issue of fact, and requiring no further steps by the aggrieved party to be preserved for appeal. [Citations.]" (*Id.* at p. 660.) "Respondent's implicit assertion of a contrary rule appears to rest entirely on *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 . . . (*Brasure*). That was a capital murder case in which the court dealt with at least a dozen major contentions before reaching the one relevant here, which was that a restitution order in favor of the victim's mother was ' "inappropriate" because of evidence (not introduced at trial) that [she] had sought a restraining order against her son and because [her] economic loss was not shown by

13

documentation or sworn testimony.' (*Ibid.*)  The court held that 'by his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute.  [Citations.]'  [Citation.]"  (*Ibid.*)

We went on to say, "Respondent apparently reads *Brasure* as a repudiation or abandonment of the rule noted above, i.e., that no predicate objection is required to challenge the sufficiency of the evidence on appeal.  We cannot join in this reading.  The Supreme Court itself explicitly reaffirmed the stated rule in *People v. Butler* (2003) 31 Cal.4th 1119, 1126 . . . .  Nor is a contrary rule suggested by [*People v. Smith* (2001) 24 Cal.4th 849], 852. . . . the one decision cited on this point in *Brasure, supra,* 42 Cal.4th at page 1075 . . . .  The court in *Smith* listed a number of decisions imposing a forfeiture of objections going to *defects of form or procedure,* such as a failure to state reasons for a sentence choice or to make a required finding.  [Citation.]  It did not purport to hold that a party may similarly forfeit an objection to *the sufficiency of the evidence.  Brasure* cannot be understood to have adopted such a rule."  (*In re K.F*., *supra*, at p. 661.)

Accordingly, we will address appellant's contention.[12]

As described in the probation officer's report, count five was based on appellant using a stolen credit card to make a $2,643.36 purchase of a computer and accessories from a Best Buy store.[13]  The record shows that Citibank received a claim of unauthorized use of a credit card from their customer and sustained a financial loss connected with that transaction.  We glean from this Citibank absorbed the loss from the fraudulent transaction.  Notwithstanding the probation officer's recommendation that the court award restitution to Best Buy, no evidence was presented by Best Buy that they

---

[12]    In so doing, we need not address appellant's alternative claim that counsel was ineffective in failing to object to the restitution award to Best Buy.

[13]    The amount of the transaction is described as $2,643.56 in one part of the probation officer's report and $2,643.36 in another.  In a letter from Citibank that is attached to the probation officer's report, the bank claimed that their loss was $2,643.56.  However, since $2,643.36 was the amount the court awarded to Best Buy, for the sake of clarity we will use this amount as the amount of the fraudulent transaction.

14

sustained any loss.  To the contrary, the evidence showed that they had no idea if they sustained a loss.

Citing *People v. Birkett* (1999) 21 Cal.4th 226, 246 (*Birkett*) and *People v. Hamilton* (2003) 114 Cal.App.4th 932, 944 (*Hamilton*), respondent argues that a court must order restitution to a victim who has suffered economic loss regardless of that victim's reimbursement from other sources.  In general, we do not disagree with this contention.  In *Birkett*, the Court of Appeal had upheld a trial court order that split a mandatory probationary restitution award for the full amount of certain direct victim losses between the victims themselves and the insurers who had partially reimbursed them.  (*Id*. at p. 229.)  The issues before the Supreme Court were whether the 1994 laws governing mandatory restitution as a condition of adult probation gave insurers a *right* to restitution insofar as they had reimbursed their insureds for crime-related losses, and if not, whether trial courts nonetheless had *discretion* to allocate mandatory probationary restitution awards between insurers and insureds to reflect such reimbursements.  (*Id.* at p. 228.)  Our Supreme Court held that restitution could not be awarded to insurers that partially reimbursed the direct victims for their losses, nor could the court divide the full amount of restitution between the victims and their insurers.  (*Id*. at p. 246.)  The *Birkett* court noted that "the criminal restitution scheme should always require the offender to pay the full cost of his crime, receiving no windfall from the fortuity that the victim was otherwise reimbursed, but that the rights of reimbursing third parties, aside from the state's own Restitution Fund, should be resolved in other contexts."  (*Ibid*.)  In contrast to this case, there was no question in *Birkett* that the victims had suffered an economic loss; the court had held a restitution hearing at which the court took evidence about the amount of the victims' losses.  (*Id*. at p. 229.)  Such is not the case here.

*Hamilton*, *supra*, 114 Cal.App.4th 932, involved the shooting of a person who was working for the defendant and the defendant's mother.  When the victim sued them in a civil action, the mother's insurer settled the claim on her behalf.  (*Id.* at p. 935.)  The

Court of Appeal held that the victim restitution orders imposed in the criminal actions could not be offset by settlement payments in the civil action because the defendant did not procure the insurance policies or pay the insurance premiums. (*Id.* at p. 942.)

The crucial difference between this case and *Hamilton* is that the defendant in *Hamilton* was not being asked to pay for a loss for which there was no evidence to support the award. Rather, he was being asked to pay for the actual loss he caused even though the victim had received an insurance settlement. The value of the loss appellant caused in this case was $2,643.36; either Citibank *or* Best Buy sustained that loss. Citibank provided evidence that they had sustained such a loss, Best Buy did not. There is no authority allowing imposition of a restitution order for which there is no supporting evidence.[14]

Accordingly, we will strike the restitution order as it pertains to Best Buy.

*Presentence Custody Credits under Section 4019*

When appellant was sentenced in October 2011 for crimes he committed in July 2009, the court awarded him 768 days of presentence custody credits and 384 days of conduct credits. Appellant was arrested on September 10, 2009, and he remained in custody until he was sentenced to state prison on October 17, 2011.

Appellant argues on equal protection grounds that he was entitled to the enhanced conduct credits provided by an amendment to section 4019 that became operative on October 1, 2011.

Prior to sentencing, a criminal defendant may earn credits while in custody to be applied to his or her sentence by performing assigned labor or for good behavior. Such

---

[14] The rational inferences to be drawn from the evidence that Citibank sustained the loss are that either Peng was reimbursed for the loss by Citibank or Best Buy was reimbursed for their loss. If Peng was reimbursed by Citibank for the loss, Peng must necessarily have paid the credit card bill otherwise Peng would not have sustained a loss for which Citibank needed to provide reimbursement. Either way, Best Buy was paid for the computer and accessories.

16

credits are collectively referred to as "conduct credit."  (*People v. Dieck* (2009) 46 Cal.4th 934, 939 & fn. 3.)

Before January 25, 2010, conduct credits under section 4019 could be accrued at the rate of two days for every four days of actual time served in presentence custody (sometimes referred to a one third time or credits calculated at 33 percent).  (Stats.1982, ch. 1234, § 7, p. 4553 [former § 4019, subd. (f) ]; *People v. Dieck, supra,* 46 Cal.4th at p. 939 [section 4019 provides a total of two days of conduct credit for every four-day period of incarceration].)

Between January 25 and September 28, 2010, a defendant could accrue presentence conduct credit at a rate of two days for every two days spent in actual custody (sometimes called one-for-one credits) except for those defendants required to register as a sex offender, those committed for a serious felony (as defined in § 1192.7), or those who had a prior conviction for a violent or serious felony such as appellant. (Stats. 2009–2010, 3d Ex.Sess., ch. 28, §§ 50, 62 [the January 2010 amendment to § 4019, subds. (b), (c), & (f) ].)[15]

Effective September 28, 2010, section 4019 was amended again to restore the presentence conduct credit calculation that had been in effect prior to the January 2010 amendments, eliminating the enhanced credits. (Stats. 2010, ch. 426, § 2.)  By its express terms, the newly created section 4019, subdivision (g), declared these September 28, 2010 amendments applicable only to prisoners confined for a crime committed on or after that date, expressing legislative intention that they have prospective application only. (Stats. 2010, ch. 426, § 2.)

---

[15]  For those defendants required to register as a sex offender, those committed for a serious felony (as defined in § 1192.7), or those who had a prior conviction for a violent or serious felony conduct credits continued to be calculated at two days for every four days of actual custody.  (Stats. 2009–2010, 3d Ex.Sess., ch. 28, §§ 50, 62 [the January 2010 amendment to § 4019, subds. (b), (c), & (f)].)

This brings us to legislative changes made to section 4019 in 2011 as relevant to appellant's equal protection challenge. These statutory changes, among other things, reinstituted one-for-one conduct credits and made this change applicable to crimes committed on or after October 1, 2011, the operative date of the amendments, again expressing legislative intent for prospective application only.[16] (§ 4019, subds. (b), (c), & (h).) With the October 2011 amendment, all defendants sentenced to jail or prison for crimes committed on or after October 1, 2011 may earn presentence conduct credit at that rate. (§ 4019, subds.(b), (c), & (f); Stats.2011, ch. 15, § 482; Stats.2011, ch. 39, § 53.) That is, the amendment to section 4019 deleted conduct credit restrictions imposed on defendants with prior serious or violent felony convictions, those committed for serious felonies, and persons required to register as sex offenders.

Notwithstanding the express legislative intent that the changes to section 4019, operative October 1, 2011, (hereafter the October 2011 amendment) are to have prospective application only —i.e. to crimes committed on or after the operative date of the statute, appellant contends that the October 2011 amendment to section 4019 violates the equal protection clauses of the federal and California Constitutions if it is not applied retroactively.

Preliminarily, we note that to succeed on an equal protection claim, a defendant must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836–837.)

Appellant contends that *In re Kapperman* (1974) 11 Cal.3d 542 and *People v. Sage* (1980) 26 Cal.3d 498 support his equal protection argument.

---

[16]    These changes took place by two separate amendments. (Stats. 2011, ch. 15, § 481; Stats. 2011, ch. 39, § 53.) Section 4019 was also amended a third time in 2011, in respects not relevant here. (Stats. 2011, 1st Ex. Sess., ch. 12, § 35.)

In *Kapperman*, *supra*, 11 Cal.3d 542, our Supreme Court reviewed a provision (then-new Penal Code section 2900.5) that made actual custody credits prospective, applying only to persons delivered to the Department of Corrections after the effective date of the legislation. (*Id.* at pp. 544–545.) The court concluded that this limitation violated equal protection because there was no legitimate purpose to be served by excluding those already sentenced, and extended the benefits retroactively to those improperly excluded by the Legislature. (*Id.* at p. 545.) In our view, *Kapperman* is distinguishable from the instant case because it addressed *actual* custody credits, not *conduct* credits. Conduct credits must be earned by a defendant, whereas custody credits are constitutionally required and awarded automatically on the basis of time served.

Our Supreme Court recently confirmed, "[c]redit for time served is given without regard to behavior, and thus does not entail the paradoxical consequences of applying a statute intended to create incentives for good behavior. *Kapperman* does not hold or suggest that prisoners serving time before and after the effective date of a statute authorizing conduct credits are similarly situated." (*People v. Brown* (2012) 54 Cal.4th 314, 330 (*Brown*).)

Although the Supreme Court in *Brown* was concerned with the January 2010 amendment to section 4019 (*Brown*, *supra*, 54 Cal.4th at p. 318), the reasoning of *Brown* applies with equal force to the prospective-only application of the current version of section 4019.

As can be seen, in *Brown,* our Supreme Court expressly determined that *Kapperman* does not support an equal protection argument, at least insofar as conduct credits are concerned. (*Brown, supra,* 54 Cal.4th at pp. 328–330.) In rejecting the defendant's argument that the January 2010 amendments to section 4019 should apply retroactively, the Supreme Court explained "the important correctional purposes of a statute authorizing incentives for good behavior [citation] are not served by rewarding prisoners who served time before the incentives took effect and thus could not have

19

modified their behavior in response. That prisoners who served time before and after former section 4019 took effect are not similarly situated necessarily follows." (*Brown, supra,* at pp. 328–329.)

More importantly, in *Brown*, the Supreme Court confirmed that the October 2011 amendments to Penal Code section 4019 have prospective application only. The court noted that the defendant had filed a supplemental brief in which he contended that he was entitled to retroactive presentence conduct credits under the 2011 amendment to Penal Code section 4019. The Supreme Court stated that this legislation did not assist the defendant because the "changes to presentence credits expressly 'apply prospectively . . . to prisoners who are confined to a county jail [or other local facility] *for a crime committed [on] or after October 1, 2011*.' (§ 4019, subd. (h), added by Stats. 2011, ch. 15, § 482, and amended by 2011, ch. 39, § 53.) Defendant committed his offense in 2006." (*Brown*, *supra*, 54 Cal.4th at p. 322, fn. 11.) Similarly, here, appellant committed his offenses in 2009.

*Sage* is similarly inapposite because it involved a prior version of section 4019 which allowed presentence conduct credits to misdemeanants, but not felons. (*Sage, supra,* 26 Cal.3d at p. 508.) Our Supreme Court found that there was neither "a rational basis for, much less a compelling state interest in, denying presentence conduct credit to detainee/felons." (*Ibid.*) The purported equal protection violation at issue here is temporal, rather than based on the defendant's status as a misdemeanant or felon. In *Brown, supra,* 54 Cal.4th at page 329, the Supreme Court acknowledged that "one practical effect of [the Sage decision] was to extend presentence conduct credits retroactively to detainees who did not expect to receive them, and whose good behavior therefore could not have been motivated by the prospect of receiving them." However, the Supreme Court declined to read *Sage* as implicitly holding that prisoners serving time before and after a conduct credit statute takes effect are similarly situated for purposes of equal protection, because that proposition was not considered in the case. (*Id*. at p. 330.)

20

Finally, for equal protection purposes, even if we were to agree that the time that appellant spent in county jail between October 1, 2011 and the time he was sentenced on October 17, 2011, appellant was similarly situated to other defendants who committed their crimes after October 1, and were in presentence custody, where, as here, the statutory distinction at issue neither "touch[es] upon fundamental interests" nor is based on gender, there is no equal protection violation "if the challenged classification bears a rational relationship to a legitimate state purpose. [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200; see also *People v. Ward* (2008) 167 Cal.App.4th 252, 258 [rational basis review applicable to equal protection challenges based on sentencing disparities].)

We perceive such a plausible reason in this case as to the period of time defendant was in custody after October 1, 2011.

As our Supreme Court has acknowledged, "statutes lessening the *punishment* for a particular offense" may be made prospective only without offending equal protection principles. (*Kapperman, supra,* 11 Cal.3d at p. 546.) In *Kapperman,* the court wrote that the Legislature may rationally adopt such an approach, "to assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written." (*Ibid.*)[17]

In *People v. Floyd* (2003) 31 Cal.4th 179 (*Floyd* ), the defendant sought to invalidate a provision of Proposition 36 barring retroactive application of its provisions for diversion of nonviolent drug offenders. (*Id.* at pp. 183–184.) The court reiterated that the Legislature may preserve the penalties for existing offenses while ameliorating punishment for future offenders in order to " 'assure that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written.' " (*Id.* at p. 190.) The statute before the court came within this rationale because it

---

[17] In *Kapperman,* the court found that rationale inapplicable to the issue before the court. (*Kapperman, supra,* 11 Cal.3d at p. 546.)

"lessen[ed] punishment for particular offenses." (*Ibid.*) As the *Floyd* court noted, " '[t]he Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' [Citation.]" (*Id.* at p. 191.)

"The very purpose of conduct credits is to foster constructive behavior in prison by reducing punishment." (*People v. Lara* (2012) 54 Cal.4th 896, 906.) As our Supreme Court accepted in *Brown, supra,* 54 Cal.4th 314, "to increase credits reduces punishment." (*Id.* at p. 325, fn. 15.)

We gather that the rule acknowledged in *Kapperman* and *Floyd* is that a statute ameliorating punishment for particular offenses may be made prospective only without offending equal protection, because the Legislature will be supposed to have acted in order to optimize the deterrent effect of criminal penalties by deflecting any assumption by offenders that future acts of lenity will necessarily benefit them.

Defendant committed his crimes in 2009. At that time, his ability to earn conduct credit was limited to two days for every four days of actual time served in presentence custody. (Stats. 1982, ch. 1234, § 7.)

Although the statute at issue here does not ameliorate punishment for a particular offense, it does, in effect, ameliorate punishment for all offenses committed after a particular date. By parity of reasoning to the rule acknowledged by both the *Kapperman* and *Floyd* courts, the Legislature could rationally have believed that by making the 2011 amendment to section 4019 have application determined by the date of the offense, they were preserving the deterrent effect of the criminal law as to those crimes committed before that date. To reward appellant with the enhanced credits of the October 2011 amendment to section 4019, even for time he spent in custody after October 1, 2011, weakens the deterrent effect of the law as it stood when appellant committed his crimes. We see nothing irrational or implausible in a legislative conclusion that individuals

22

should be punished in accordance with the sanctions and given the rewards (conduct credits) in effect at the time an offense was committed.

Finding no equal protection violation, we affirm appellant's custody credit award.

*Disposition*

We modify the judgment by striking the restitution order awarding Best Buy $2,643.36. The clerk of the court is directed to amend the abstract of judgment accordingly and forward a copy to the Department of Corrections and Rehabilitation. As so modified the judgment is affirmed.

_____

ELIA, Acting P. J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

MÁRQUEZ, J.